**UNITED STATES of America, Appellee,**

v.

**Ralph MARIANI, Appellant.**

**No. 898, Docket 76–1075.**

United States Court of Appeals, Second Circuit.

Argued April 5, 1976.

Decided July 19, 1976.

As Amended Aug. 16, 1976.

Stephen Flamhaft, Brooklyn, N.Y., for appellant.

Cheryl M. Schwartz, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (David G. Trager, U.S. Atty., Josephine Y. King, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before ANDERSON, MULLIGAN and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Ralph Mariani appeals from a judgment of conviction of aiding and abetting a bank robbery by force, violence or intimidation (Count One) and of aiding and abetting an armed bank robbery (Count Two) in violation of 18 U.S.C. §§ 2113(a), (d) and 2, entered in the United States District Court for the Eastern District of New York, Platt, J., after a jury trial. Appellant was sentenced to consecutive terms of eight years imprisonment on each count; execution of the sentence on Count Two was suspended, however, and appellant was placed on probation for five years on that count.

Mariani raises four claims of error on appeal: (1) that the evidence was insufficient to sustain a finding of guilt beyond a reasonable doubt; (2) that his prior narcotics conviction should not have been admitted into evidence because its prejudicial impact outweighed its probative value; (3) that it was reversible error to allow the government to impeach his credibility as a witness with bullets unlawfully seized from his car; and (4) that the district court abused its discretion in denying appellant's motion for severance. Finding his third claim meritorious, we reverse and remand for a new trial.

Initially we must observe that, unnoticed by either side, there was clear error in sentencing that would have required correction however we might rule on appellant's other arguments. It is settled in this Circuit that while simultaneous judgments of conviction under more than one subsection of the Federal Bank Robbery Act may be entered, "simultaneous sentences, whether concurrent or consecutive, under subsections (a) and (d) [of 18 U.S.C. § 2113] are improper." *United States v. Stewart,* 523 F.2d 1263, 1264 (2 Cir. 1975) (*per curiam*). *See also United States v. Stewart,* 513 F.2d 957 (2 Cir. 1975); *United States v. Pravato,* 505 F.2d 703 (2 Cir. 1974); *Gorman v. United States,* 456 F.2d 1258 (2 Cir. 1972). The district court thus erred in sentencing Mariani under both subsection (a) and subsection (d).

I. *Sufficiency of the Evidence.*

Appellant first contends that the government's evidence at trial was insufficient as a matter of law to sustain his conviction. Since we conclude that Mariani is entitled to a new trial because of prejudicial error in an evidentiary ruling (Part II–B, *infra*), we consider this sufficiency question only insofar as it pertains to appellant's demand for a judgment of acquittal. *United States v. Singleton,* 532 F.2d 199, 201 (2 Cir. 1976). In so doing, of course, we must consider the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), taking into account the evidence presented by appellant in addition to that offered by the government. *United States v. Johnson,* 513 F.2d 819 (2 Cir. 1975); *United States v. Pui Kan Lam,* 483 F.2d 1202 (2 Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1577, 39 L.Ed.2d 881 (1974); *United States v. Arcuri,* 405 F.2d

691 (2 Cir. 1968), *cert. denied,* 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969).

Acting on an informant's tip that a stolen red and white gypsy taxicab would be used to rob a particular bank on August 25, 1975, detectives from the Major Case Squad of the New York City Police Department kept that vehicle under surveillance. During that afternoon, the detectives saw two Hispanic males enter the cab which was parked on Argyle Road in Brooklyn, about ten blocks from the bank. Appellant Mariani sat in the driver's seat while his co-defendant, Felix Acevedo, sat in the right rear seat. The detectives noted that Acevedo had a large "Afro" hairstyle. Briefly pausing twice at the curb, the cab proceeded towards the bank, slowed down and passed by it, only to return to the bank about five minutes later. Mariani, the driver, double parked in front of the bank and kept the engine running.

Acevedo, carrying a brown manila envelope, left the cab, twice looking back at it before he entered the bank. When he reached the teller's window, he pointed a short barrelled revolver at the teller and instructed her to fill the manila envelope with money. Acevedo left the bank with the envelope filled with money and the gun, only to be arrested a short distance away. The police took custody of the envelope, Acevedo's sunglasses, Afro wig, and gun. The gun was loaded and operable.

Shortly after Acevedo entered the bank, Mariani drove away at a high rate of speed, traveling down two one-way streets in the wrong direction, finally colliding with another car. He abandoned the cab and successfully eluded the police. Acevedo was taken into custody by special agents of the Federal Bureau of Investigation. He signed a statement admitting his attempt to rob the bank and also made an oral statement about Mariani's role in the effort; this latter statement was not offered in evidence because of possible complications arising from the holding in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

That evening a police detective and an FBI agent waited for three hours in Mariani's apartment to arrest him. At 8 P.M. they left the apartment and stationed themselves outside the building until almost midnight, when they re-entered the apartment and arrested Mariani.

Mariani gave the FBI agents written permission to search his car, which was parked on the same block where he was first seen entering the cab. Questioned at FBI headquarters, he at first denied being involved in the robbery but later signed a statement to the contrary, after being advised of his constitutional rights.[1] Upon Mariani's subsequent allegation that the statement was involuntary, the district court ruled that the claim of coercion was unfounded.

Mariani testified in his own behalf. He stated that although he had been a drug addict in 1969 and had pleaded guilty to possession, he had become drug free through a rehabilitation program connected with his probation. In 1975 he pleaded guilty to a possession charge but claimed that he was innocent of that offense and had had no drugs in his possession but was in the company of a person who did. He stated that he entered a guilty plea as a "quick way out" and, in fact, did receive

1. The pertinent part of Mariani's statement reads as follows:

On August 25, 1975 Felix Acevedo and I met on the street. He invited me to go for a ride in a car and he asked me to drive the car. I drove the car which was a red and white Dodge. Acevedo directed me to drive by 1600 Cortelyou Road, Brooklyn, New York, and then he directed me to stop next to the Chemical Bank.

He [Acevedo] asked me to wait for him and he indicated he was going to go and get some money.

I saw him go into the bank and assumed that he was going in to rob the bank. I knew he was armed and I did not want to get involved. I panicked and I left as fast as I could. I do not know for certain if I was being followed.

I found myself going the wrong way on a one-way street, hitting another automobile and having lost the brakes in the car I was driving.

I finally abandoned the car on Rugby Road

only a $100 fine as a sentence. As of the day of the robbery, Mariani had been unemployed for five months. He testified that Acevedo had agreed to take Mariani to where Mariani's car was parked, 15–20 blocks from his home, in order for Mariani to drive to an appointment with his unemployment officer but that Acevedo first wanted to "cop some dope." The men entered the cab, which Mariani said was parked in front of Mariani's apartment building on East 19th Street, and Acevedo drove the gypsy cab to a location where he evidently "shot some drugs." Because Acevedo returned to the car nodding and staggering, Mariani decided to drive the cab back to the location of his car. Acevedo directed him to turn down 16th Street and to stop next to the bank. Mariani testified that there had been no prior conversation about going to the bank or robbing it. He further stated in direct contradiction to the government witnesses' testimony, that they had not driven past the bank once and that Acevedo was sitting in the front seat, not in the rear seat. Acevedo, according to Mariani's testimony, then took a brown folder from under the seat, donned a wig and sunglasses, and removed a gun from under his belt. He told Mariani to wait for him and that he was going to get some money. Mariani stated that it was at this moment that he realized that Acevedo was going to rob the bank. Fearful of being involved and recognized, Mariani said that he sped off before Acevedo entered the bank. When he learned from his wife that FBI agents wanted to question him, he told her that he would turn himself in, and he did call FBI headquarters to leave a message to that effect. He was arrested before he accomplished this plan.

Mariani acknowledged that he initially denied that he knew anything about the robbery. He later signed a statement summarizing his conversation in Spanish with the agents in which he said that he drove the cab and that he "assumed" Acevedo was going to rob the bank when he entered it.[2] Mariani testified that the government witnesses had erroneously placed Acevedo in the back seat of the cab and had lied with they said that he initially denied being in the vicinity of the robbery. He also disclaimed having told FBI agents on the night of his arrest that he wanted to be in a drug program. Mariani further denied giving the FBI agents written permission to search his car, but his recollection was refreshed when he was shown the document. He also denied telling the agents that they would find bullets in his car if it were searched.

It is a basic principle of criminal law that to be convicted of aiding and abetting, more than "mere presence" at the scene is required. Rather, the defendant must be shown to have knowingly associated with and participated in the criminal venture in a manner designed to accomplish its goal. *United States v. Johnson, supra,* 513 F.2d at 823; *United States v. Dickerson,* 508 F.2d 1216, 1218 (2 Cir. 1975); *United States v. Peoni,* 100 F.2d 401, 402 (2 Cir. 1938). We disagree with appellant's contention that the government succeeded in establishing only his mere presence at the scene of the bank robbery.

A surveillance team, tipped off that a bank robbery would be committed by the occupants of a particular stolen cab, saw Mariani and Acevedo enter the cab on Argyle Road. Acevedo sat in the rear while Mariani drove. Mariani drove past the bank once and then returned and double parked, keeping the motor running. Acevedo, carrying a manila envelope, twice glanced back at the cab before entering the

2. Mariani was questioned in Spanish by Agent Garcia at FBI headquarters. A statement was prepared in English which summarized the conversation. At trial Mariani testified that some of the language used in the statement was Agent Garcia's expression and not his own. For example, where the statement read "panicked," Mariani said his words in Spanish meant "scared." Where the statement read "assumed," Mariani translated his Spanish words as meaning "thought." Appellant stated that he signed the statement quickly "to get it over with" and that he does not like to read. However, he did not claim any coercion to sign or lack of opportunity to read the document.

bank. After two to five minutes, Mariani sped off, engaging in extraordinary traffic maneuvers before he abandoned the cab. His own car was found parked on the very block where he was first seen entering the cab. While this evidence is less than overwhelming, we cannot conclude that it is insufficient to support the jury verdict as a matter of law. Mariani's actions during the surveillance period could support an inference by the jury that he was to be the getaway driver for the robbery.

Moreover, parts of Mariani's own testimony directly contradicted that of the surveilling agents. For example, Mariani claimed that he got into the cab in front of his apartment rather than on Argyle Road, that he never drove past the bank, that Acevedo sat in the front seat beside him rather than in the rear seat. Having denied on the witness stand that he gave the FBI agents written permission to search his car, Mariani's memory was refreshed by examination of the document itself. Because of these discrepancies, the jury could rationally discredit his entire story about the innocent purposes of his actions, *United States v. Pui Kan Lam, supra,* 483 F.2d at 1208, or interpret its incredibility as further support for a contrary inference. *United States v. Arcuri, supra,* 405 F.2d at 695; *Dyer v. MacDougall,* 201 F.2d 265, 269 (2 Cir. 1952). Therefore, we are not persuaded by appellant's claim that the evidence was insufficient and his conclusion that justice demands a judgment of acquittal.

II. *Evidentiary Rulings.*

A. *Prior Narcotics Conviction.*

■ Appellant argues that the district court abused its discretion by admitting into evidence his six year old narcotics conviction.[3] We do not rule on the merits of this issue since we conclude that appellant

waived his objection to the court's pretrial ruling by himself offering the evidence as part of his case-in-chief.

During appellant's arraignment, defense counsel sought a pretrial ruling that the government would be precluded from questioning appellant about his prior conviction if he took the stand. The court ruled that the 1969 conviction would be admissible as highly probative of underlying motive to rob a bank.[4] Defense counsel took an exception to this ruling. The government did not introduce the conviction in its direct case. Apparently anticipating that the government would attempt to introduce the damaging information during its cross-examination of Mariani, defense counsel himself elicited the fact of the 1969 conviction during direct examination of appellant, when Mariani described his successful rehabilitation from drug addiction. The government did not mention the 1969 conviction in either its cross-examination of Mariani or its summation. The district court's jury charge limited consideration of the prior conviction to the jury's assessment of the witness' credibility. Thus, we have before us the peculiar situation of a pretrial ruling to which an objection was made, followed by the objector himself introducing the evidence as a matter of trial strategy, with the government at no time commenting on the evidence, and a jury charge changing the rationale for admitting the evidence in the first place.[5]

■ We note that appellant's presentation of his prior conviction placed it in its most favorable light by relating it to Mariani's successful withdrawal from drugs. At no time had the government committed itself to using the 1969 conviction for impeachment. Once introduced, the government did not comment on the evidence in its cross-examination or summa-

3. *See* Fed.R.Evid. 404(b), 609(a), (b).

4. Because of the district court's rationale that the 1969 drug conviction might be probative of motive, it is unlikely that the court then knew that Mariani had been drug free since 1973.

5. In fact, the jury charge limiting the use of prior convictions to credibility is one that normally results from the introduction of this evidence on cross-examination by the government.

tion.[6] Furthermore, in its pretrial ruling that the conviction was relevant to motive to rob a bank, the district court obviously believed that Mariani was still an addict, a fact later shown to be untrue by his uncontradicted testimony at trial. The court, therefore, would have had to reconsider its rationale for admitting the evidence when the proper time to do so arose, namely, after an objection made at the time of offering. Thus, in the context of this case, even if the original ruling by the trial court was erroneous, an issue that we do not resolve, defense counsel's own use of the evidence in its direct examination as a matter of trial strategy cured any error. *See, United States v. Truitt*, 440 F.2d 1070 (5 Cir. 1971); *Trouser Corporation v. Goodman & Theise*, 153 F.2d 284, 288 (3 Cir. 1946); 1 Wigmore on Evidence § 18(D) (3d Ed. 1975 Supp.); McCormick's Handbook on the Law of Evidence § 55 (2d Ed. 1972). We emphasize that this is not a case in which the objector introduced similar evidence to explain or rebut evidence already admitted over his objection, *see, e. g., United States v. Modern Reed & Rattan Co.*, 159 F.2d 656 (2 Cir.), *cert. denied,* 331 U.S. 831, 67 S.Ct. 1510, 91 L.Ed. 1845 (1947). Rather, where one who objects to a pretrial ruling himself introduces the evidence in order to present it in its most favorable light, and that evidence forms no significant part of his opponent's case, he cannot later be heard to complain that its admission constituted reversible error.[7]

6. In 1975 Mariani pleaded guilty to possession of drugs in state court. At his federal trial he explained this conviction by claiming that only his companion had had drugs in his possession. The government did comment on this explanation in its summation. Mariani has not argued that the 1975 conviction was improperly admitted into evidence.

7. Although the holding of *Rice v. Louisville and Nashville Railroad Company*, 309 F.2d 930 (6 Cir. 1962), seems to conflict with that reached here, its facts distinguish it from the instant case. There, in a pre-trial ruling, the trial court indicated that it would permit the defendant to introduce evidence of intoxication in a negligence case. Plaintiff's counsel objected but then brought this information before the jury in his opening statement and in his direct case.

## B. *Bullets.*

Further factual background is necessary to evaluate appellant's claim that the government's use of certain bullets seized from his car to impeach his credibility was impermissible and substantially prejudicial. We begin by presenting an overview of the sequence of events and then proceed to a more detailed consideration of Mariani's testimony.

After Mariani was arrested, he gave the FBI agents written permission to search his car. During the search the agents discovered and seized certain bullets. The legality of the consent to search was never determined, since the government advised the court that it did not intend to use the evidence in its direct case; the government did, however, reserve the right to introduce the evidence as part of its cross-examination or rebuttal case. At that time, the government stated its contention that whether or not the search was illegal, the bullets nevertheless would be admissible for impeachment purposes. Mariani's counsel noted that although the appellant planned to testify, counsel foresaw no part of this direct testimony that would, on cross-examination, provide an opportunity to introduce tainted evidence. He then requested a hearing on the voluntariness of the consent to search, which the trial court rejected as premature. Mariani did, of course, testify and we shall examine his testimony presently.

The Court of Appeals found this evidence highly inflammatory and of doubtful competence. Counsel for defendant injected the intoxication issue into the case at every possible opportunity. Besides cross-examining plaintiff at length on the subject, he introduced four other witnesses to testify on the issue. Since plaintiff continued to object at every point such evidence was presented and since the evidence became a focal point in the case, the court ruled that plaintiff had not waived his initial objection by being the first to mention the evidence. None of these aggravating circumstances are present in the instant case, where the government never mentioned the 1969 conviction, in effect allowing the appellant to present the damaging information in the light most favorable to him.

■ Predictably, the admissibility issue did arise at trial during the government's cross-examination of appellant;[8] the court ruled that the bullets could be marked for identification and shown to Mariani for impeachment purposes, since Mariani had denied during cross-examination that he told an FBI agent that he would find bullets in the car. In its jury charge, the district court did not include a limiting instruction about the use of the bullets. Defense counsel neither requested such a charge nor objected to its omission.[9] The court charged the jury in supplemental instructions that the bullets could not be used as substantive evidence.[10] The need for such an additional charge became apparent when the jury twice requested information about the bullets. In its first note to the court, the jury requested a review of testimony about the caliber of the bullets found in Mariani's car. A search of the record revealed that no such testimony had been given, and the jury was so informed. A second note from the jury requested one bullet from Acevedo's gun and one bullet from those found in Mariani's car. The court, instructing the jury about the limited use to be made of the bullets from Mariani's car, offered to provide the bullet from Acevedo's gun. One juror advised the court that this was unnecessary in light of the ruling on the Mariani bullet. Shortly thereafter, Mariani was found guilty.

■ We first note that the legality of Mariani's written consent to search his car was not determined by the district court. That appellant executed a written consent would not be conclusive with respect to its voluntariness. Nor would the fact that, at the time Mariani gave such consent, he had been arrested and was in custody necessarily mean that his consent was involuntary. Rather, the district court would have had to ascertain from the "totality of the circumstances" whether the consent was "essentially free and unconstrained." *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598, 44 U.S.L.W. 4112, 4116 (1976); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Wiener*, 534 F.2d 15 (2 Cir., 1976). Since the district court held no hearing on the legality of the search and seizure, and since the government argues that, even if the search were improper,

**8.** The government argues in its brief that "defense counsel raised no objection at the time of the . . . questioning of Mariani concerning the bullets in his car," thus waiving any claim of error. (Government's Brief at 19.) We charitably characterize this waiver argument as disingenuous. During the government's cross-examination about whether Mariani ever had a gun or bullets in his car, there was a side bar conference at which the court ruled that if, on cross-examination, appellant denied he had told FBI agents anything about bullets in his car, the government might impeach his credibility by introducing the bullets. The following colloquy occurred between the court and defense counsel:

The Court: You understand that my ruling relates to the question of credibility.

Mr. Flamhaft: I understand that it's your Honor's reasoning.

The Court: It has nothing to do with the search and seizure question.

Mr. Flamhaft: I understand that. I understand your Honor's ruling. I strenuously object to it, though.

The Court: This is what happens when you put a defendant on the witness stand. He's subjected to cross-examination. The cross-examination is for all practical purposes unlimited as far as credibility is concerned.

Mr. Flamhaft: I think that the mention of these bullets now is so prejudicial and—it goes far beyond the field of credibility.

The Court: It was up to your client.

From this exchange, there can be little doubt that counsel indeed objected to the introduction of the bullets as outside the permissible scope of cross-examination for credibility purposes.

**9.** We do not feel that such omission rises to the level of plain error warranting reversal on this ground. *United States v. Glazer*, 532 F.2d 224 (2 Cir. 1976); *United States v. Bermudez*, 526 F.2d 89 (2 Cir. 1975).

**10.** The district court's supplemental charge was as follows, in pertinent part:

". . . the bullets were not marked into evidence. They were used for the purpose of testing the credibility of Mr. Mariani on cross-examination and for that limited purpose only. I will not try to paraphrase what Mr. Mariani said with respect to the bullets, but they were not admitted into evidence so you may not have them. They are not exhibits."

the bullets would have been available for impeachment purposes under the principles expressed in *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) and *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), we shall assume without deciding that the bullets were taken unlawfully from appellant's car. The question which remains is whether in this case the prosecution could make use of evidence obtained by an unlawful search for impeachment purposes during cross-examination. The answer to that question lies in the scope of Mariani's testimony on direct examination.

In *Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), the Supreme Court held that evidence resulting from an illegal search and seizure could not be introduced against a defendant as evidence to rebut his testimony on cross-examination that he had never seen a can of cocaine where, on direct examination, the defendant was not asked about and did not testify about that can of cocaine. *Walder v. United States, supra,* did not alter this principle. In *Walder,* the defendant, on trial for possession of narcotics, testified on direct examination that he had never possessed, sold or purchased any narcotics. The government, to impeach the defendant's credibility, was permitted to call to the stand an officer who had participated in the unlawful seizure of narcotics from the defendant and the chemist who analyzed the seized materials. The Supreme Court upheld the admissibility of such evidence because, by his sweeping claim on direct examination that he never had been involved with drugs, the defendant "[o]f his own accord . . . went beyond a mere denial of complicity in the crimes of which he was charged" and opened the door for impeachment via the unlawfully seized evidence. 347 U.S. at 65, 74 S.Ct. at 356. The situation in *Agnello* was "sharply contrasted" as one in which the government attempted to "smuggle" in tainted evidence on cross-examination. Id. at 66, 74 S.Ct. 354. Similarly, in *Harris v. New York, supra,* the Supreme Court upheld the admissibility, for impeachment purposes, of statements inadmissible in the

government's case-in-chief under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where those statements sharply contradicted the defendant's testimony on direct examination. *See also, Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975).

The question we must decide is whether the instant case falls within the limitations of *Agnello* or the broader holdings of *Walder* and its progeny. Crucial to our ruling is an examination of Mariani's relevant testimony at trial.

Mariani testified on direct examination that he had been a drug addict in 1969 but had since become drug free. He stated that he had been convicted of possession of drugs for his own use but had never sold drugs to others. Although he admitted a 1975 state court conviction for possession, he testified that he had not personally possessed drugs but was in the company of an associate who had. Mariani related his version of his actions with Acevedo, discussed earlier. He denied planning or discussing the bank robbery with Acevedo. He explained his flight from the bank by his desire to remain uninvolved in a bank robbery because he "wouldn't rob a bank in the first place. . . ." On cross-examination, the government asked Mariani whether he owned a gun (Answer: No), had a gun in his car (Answer: A child's toy gun) or had any bullets (Answer: Not to my knowledge). When Mariani did not recall having given FBI agents written permission to search his car, the government refreshed his recollection by producing the document. Mariani admitted telling the agent that he would find a toy gun in the car but denied mentioning the bullets. It was at this point that the court permitted the government to introduce the bullets for impeachment purposes.

Mariani's testimony on direct examination clearly did not touch on the search of his car or the bullets discovered therein. Testimony on these topics was elicited solely by the government's cross-examination. In such a case, where the facts

are not dissimilar from those in *Agnello*, we hold that it is impermissible for the government to rebut, by use of evidence inadmissible in its case-in-chief, the testimony extracted from the defendant only on cross-examination.

The government contends that Mariani's broad statement that he would not rob a bank and his description of his activities on the day in question opened the door for impeachment by use of the bullets. We disagree. In those cases that have sanctioned the admission of unlawfully seized evidence, the nexus between the defendant's statements on direct examination and the contradictory evidence introduced on cross-examination was a close one. In *Walder*, the unlawfully seized narcotics were held admissible after the defendant testified that .he had never been involved with the possession, sale or purchase of drugs. Similarly, in *Oregon v. Hass, supra,* the defendant's direct testimony that he didn't know where the stolen goods came from was diametrically opposed to prior statements, inadmissible under *Miranda*, in which he identified the source of the stolen goods. In the instant case the connection between Mariani's statement that he wouldn't rob a bank and the fact that bullets were found in his car is far too tenuous to justify admission of this highly prejudicial evidence. That the jury considered the bullets as more than evidence bearing on Mariani's credibility is apparent from its attempts to determine whether the bullets found in Mariani's car would be suitable for Acevedo's gun. We cannot find that the erroneous admission of the bullets constituted harmless error in this case. Although the district court ultimately gave a supplemental limiting instruction, it is doubtful that the damage was curable at this late stage of the trial. The government's case against appellant being less than overwhelming, the use of the bullets may have been the "weight that tipped the scales" against him. *Krulewitch v. United States,* 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790

(1949). The government simply has not sustained its burden of showing that the error did not contribute to the verdict, *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and appellant merits a new trial. *See also, People v. Taylor*, 8 Cal.3d 174, 501 P.2d 918, 104 Cal. Rptr. 350 (1972), *cert. denied*, 414 U.S. 863, 94 S.Ct. 35, 38 L.Ed.2d 83 (1973).

Since at appellant's retrial there can be no severance issue, we need not decide his final claim of error that the district court abused its discretion in denying his motions to sever his trial from that of Acevedo.[11]

Reversed and remanded for a new trial.*

---

11. The district court permitted Acevedo to enter a plea of guilty to Count One after the jury had retired to begin its deliberations.

* Editor note: On Aug. 16, 1976, the mandate was ordered amended to provide for a hearing on the legality of the search of the defendant's car instead of a new car.