UNITED STATES, Appellee,

v.

Robert Anthony HICKEY, Defendant,
Appellant.

UNITED STATES, Appellee,

v.

William Lloyd FERREIRA,
Defendant, Appellant.

Nos. 78–1070, 78–1071.

United States Court of Appeals,
First Circuit.

Argued Jan. 2, 1979.

Decided April 19, 1979.

Hans R. Hailey, Boston, Mass., by appointment of the Court, for Robert Anthony Hickey, defendant, appellant.

Harry C. Mezer, Boston, Mass., with whom John Wall, Boston, Mass., by appointment of the Court, and Cullen & Wall, Boston, Mass., were on brief, for William Lloyd Ferreira, defendant, appellant.

Robert B. Collings, First Asst. U. S. Atty., Chief, Criminal Division, Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Hickey, Ferreira, and one Lynch were convicted by a jury of participating in an armed robbery of the Hancock Bank & Trust Company of Braintree, Massachusetts, on February 4, 1977. *See* 18 U.S.C. § 2113(d). Hickey and Ferreira brought these appeals, although—with one exception—on different grounds. We find no merit in Hickey's appeal and affirm his conviction. As to Ferreira, we find that an error was made that requires a new trial.

## I.

Witnesses to the robbery testified that at about 10:30 a. m. on February 4, 1977 two men entered the Hancock Bank wearing ski masks. One of them was wearing high-topped white sneakers and the other a dark jacket; one carried a sawed-off shotgun; the other jumped over the tellers' counter and stuffed money from the drawers into a blue hockey-type bag with white lettering. One of the men called out, "have a Merry Christmas" as they left the bank; they escaped in a yellow car with Massachusetts registration number 966–668.

Police officers and FBI agents testified that the car was found abandoned in the Braintree High School parking lot about half-a-mile from the bank, with the engine still running and the ignition popped. A hair brush, a sweater, and two ski masks were found in and around it.

The car's owner testified that the car had been stolen two nights before the robbery and that the hair brush and ski masks were not hers. An FBI agent testified that some hairs found on one of the ski masks, sweater, and in the hair brush were "microscopically identical" to the hairs of the defendant Ferreira.

A critical witness was one Michael McDonough, a government informant. He testified that Lynch and Hickey—whom he had known before and identified in the courtroom—came to his apartment on the day of the robbery with a third person who was introduced to him as "Bubba" and whom he identified in court as the defendant Ferreira. Lynch and Hickey were wearing leather jackets and dungarees; Hickey, and perhaps "Bubba," had on sneakers. McDonough related that Hickey displayed a shotgun and that the three "just walked in," over his objections. "Bubba," he said, was carrying a blue gym bag from which the three emptied money. They divided the money and changed clothes, putting the clothes they had been wearing into the gym bag. They then sat in McDonough's living room and talked: Lynch said that they just had robbed "the same bank that had been robbed a few weeks earlier."[1] Hickey said that he had yelled "everyone have a Merry Christmas" as he left the bank. "Bubba" went out briefly to a pay phone to call for a

---

1. *See United States v. Cleveland,* 590 F.2d 24 (1st Cir. 1978).

ride home and, after about 30 minutes, left with Hickey.

After "Bubba" and Hickey had left, Lynch allegedly told McDonough that his car had been left in the Braintree High School parking lot while the three had taken a stolen Firebird to the bank; that Hickey and "Bubba" had gone into the bank; that they had worn ski masks and gloves; that Hickey had carried a shotgun; that "Bubba" had jumped the counter; and that afterwards they had driven back to the Braintree High School, where they had switched cars.

McDonough testified that he left Lynch in his apartment and went to work at around 3:00 p. m. When he returned, Lynch was gone but had left the blue bag with the clothes behind, along with $80 to $100. McDonough disposed of the bag in the woods and—in April—reported the robbery to the FBI on his own initiative.

## II.

Ferreira's appeal raises a close question as to the government's right to use illegally acquired evidence for impeachment purposes on cross-examination of an accused. The evidence involved is a statement elicited from Ferreira in violation of his *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When Ferreira was arrested on October 27, 1977, he was given *Miranda* warnings and said that he would not respond to any but routine questions without an attorney. Agent Nadeau nevertheless asked him whether he had ever been known as "Bubba," knowing that Ferreira's nickname would help identify him as a participant in the Hancock Bank robbery. Ferreira responded that he was not known as "Bubba," but was known as "Booboo." Prior to trial Ferreira's motion to suppress this statement was allowed—a ruling the government has not challenged.

On the third day of trial, Ferreira submitted a motion to limit cross-examination to "exclude any cross-examination of Ferreira regarding nickname or alias and specifically to exclude any reference . . .

to the previously suppressed evidence of the nickname 'Booboo,' unless Ferreira testifies with regard thereto on direct examination." After the prosecution had presented its case in chief, Ferreira's counsel, Mr. Wall, who had previously indicated that Ferreira would testify, asked for an advance ruling from the court on this motion.

Ferreira's request precipitated a lengthy colloquy between the court, the prosecutor, and Wall. By the time this discussion was over, the government had taken the position that it should be permitted to cross-examine Ferreira as to his aliases, including the alias "Booboo," and that, if Ferreira denied having been known as "Booboo," it should be permitted to use the suppressed statement to impeach him. Ferreira's position, by contrast, was that the government could not ask him about aliases or nicknames on cross-examination if he did not mention them in his direct testimony.

The court ruled, in substance, that Ferreira could be cross-examined as to his aliases or nicknames, including the name "Bubba," and that if he denied all knowledge the government could call witnesses, including Agent Nadeau, to impeach him. The government now questions, however, whether the court meant to imply that it would allow Agent Nadeau to refer to the suppressed statement for impeachment purposes.

The government suggests that the court may only have signalled a willingness to receive other evidence undercutting any denial Ferreira might make of his association with the "Booboo" or "Bubba" nicknames. As Ferreira did not take the stand, it argues that he should not be able to raise this issue on appeal, both because the court's ruling was not clear and because this court can never know what issues his direct testimony, or his answers on cross-examination, would have raised. Alternatively, and assuming that the court is taken to have ruled that the suppressed statement could be used to impeach Ferreira on cross-examination, it argues that the ruling was correct.

We disagree with the government on all three points. First, the only reasonable construction of the district court's remarks, in context, is that the court would allow Agent Nadeau to reveal Ferreira's suppressed statement if Ferreira denied association with the nickname "Booboo." There would be no other reason for letting Nadeau testify. The government suggests that Agent Nadeau might have testified as to information about Ferreira's nicknames obtained independently of the suppressed statement, but this seems fanciful. Nothing was presented to the judge which would have led him to think of Nadeau as possessing impeachment information other than the suppressed statement. We think Wall could properly have advised his client, on the basis of the judge's remarks, that, if the government cross-examined Ferreira as to nicknames, the court would allow Nadeau to impeach Ferreira by testifying about the suppressed statement.[2]

Second, we do not agree that Ferreira should not be able to challenge the court's advance ruling because he did not take the stand.[3] The Supreme Court has recently reviewed a ruling that reached it in much the same posture: the defendant had decided not to testify after a state trial judge had ruled that, if he testified and gave any answer on direct or cross-examination that was materially inconsistent with prior im-

munized testimony he had given to a Grand Jury, the prosecutor could use that testimony in his cross-examination. *New Jersey v. Portash,* —— U.S. ——, —— —— ——, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979). The Court held that the issue presented was not too abstract and hypothetical because the state trial and appellate courts had ruled on the merits—the appellate court necessarily having concluded that the federal constitutional question was properly presented. *Id.* at ——, 99 S.Ct. 1292. The court observed that federal law does not insist that states require defendants to take the stand in order to preserve their rights to contest advance rulings, and that subsequent federal review is not precluded as long as a "case or controversy" is presented.

■ In arguing that the advance ruling here cannot be reviewed, the government cites no authority and fails to distinguish the relevant issues. The first is whether the court's ruling was sufficiently definite to permit review. We find that it was. The ruling was not merely "preliminary and tentative," *see United States v. Richardson,* 588 F.2d 1235, 1241 (9th Cir. 1978), *pet. for cert. filed,* —— U.S. ——, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979)—the court did not indicate in any way that it would reconsider its decision or that it felt that it could not rule definitely until Ferreira took the stand. Mr. Wall asked the court to rule,

---

**2.** Our reading is supported by the fact that, when Mr. Wall told the court that his client would not take the stand, the following exchange occurred:

"MR. WALL: . . . I told him what your ruling was, that if he takes the stand, even though he does not discuss aliases or Booboo on direct that [the prosecutor] can ask him about aliases on cross-examination, and that *depending upon his answer in that regard, the FBI agent will be able to come in* and testify on rebuttal.

"THE COURT: *To impeach his credibility.*

. . . . .

"MR. WALL: I want the record to reflect that prior to Your Honor's ruling in that regard I was convinced, and I told him so, that he could take the stand, and if he did not testify with regard to the nicknames of Bubba or Booboo, he could not be impeached by testimony from the agent. In other words, that the Government would not be able to

bring it out on cross. . . . ." (Emphasis added.)

The court's response to Mr. Wall makes it clear that Nadeau would have been allowed to testify to contradict Ferreira on his use of the name Booboo. As we know of no basis for such testimony other than Ferreira's suppressed statement, Mr. Wall properly understood the ruling to be that the statement could be used to impeach Ferreira.

We add that Wall took special pains to ask the court to repeat its ruling. This was not a case where counsel invited error by failing to present his own position fully, or by taking advantage of a slip of the court's tongue.

**3.** Although the government urges us not to review the court's advance ruling, we note that it did not ask the court to refrain from ruling until Ferreira had taken the stand; it actively participated in the colloquy and encouraged the court to rule that the suppressed statement was admissible to impeach.

and it did rule, on the basis of Ferreira's representation that he would not mention aliases or nicknames on direct. After the ruling, Wall informed the court promptly that, as a result of its ruling, his client reversed his previously stated decision to testify, and the record, read as a whole, unquestionably supports this representation. Thus we are asked to review a ruling on a clearly posed question of law that was of immediate consequence to Ferreira—as it would be to any defendant faced with a decision whether to testify. If that ruling was wrong, it played a role it should not have played in determining whether Ferreira would exercise his right to testify in his own defense.

■ A second, albeit related, issue is whether—despite the definiteness of the court's ruling and its obvious impact on Ferreira's decision—Ferreira should be held to have waived his objections to that ruling when he chose not to testify.[4] This circuit has never adopted a rule that a defendant will be held to have waived his objections to an advance ruling unless he takes the stand. Such a rule to some extent would be inconsistent with our decision, in the special area of prior convictions, to encourage (although not to require) advance rulings on admissibility where the trial court, in its discretion, finds them appropriate. *See United States v. Oakes,* 565 F.2d 170, 173 (1st Cir. 1977). In that same area, at least two circuits have reviewed advance rulings as to the admissibility of convictions where the defendant, as a result of the ruling, decided not to testify. *Brown v. United States,* 125 U.S. App.D.C. 220, 370 F.2d 242 (1966); *United States v. Palumbo,* 401 F.2d 270 (2d Cir. 1968), *cert. denied,* 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969). Again in this special area, the Ninth Circuit apparently considers a defendant to have waived his objection to an advance ruling if he elects, on the basis thereof, not to testify, *e. g., United States v. Fulton,* 549 F.2d 1325 (9th

Cir. 1977), but this rule seems to have developed, at least in part, from considerations not germane here, *see United States v. Murray,* 492 F.2d 178, 196–97 (9th Cir. 1973), *cert. denied,* 419 U.S. 942, 95 S.Ct. 210, 42 L.Ed.2d 166 (1974).

On the facts of this case, we would be loath to hold, without precedent, that Ferreira waived his claim when he decided not to take the stand. A concrete issue existed at the time the ruling was made and, in our view, is no less present now because the immediate resolution of that issue caused Ferreira not to testify. The court made a ruling and Ferreira cannot be faulted now for having taken it at its word. It would be unfair to inform a defendant that by relying on an express ruling of the district court he had waived his right to challenge it.

■ Whether the court's ruling should now be open to review is a different question, of course, from whether it would have been preferable for the court to have declined to rule. *See Portash,* —— U.S. at ——, 99 S.Ct. 1292 (Powell, J., concurring). Here the court would have been well within its discretion had it postponed ruling on this unsettled legal question until it had heard Ferreira testify. Such a course—requiring Ferreira to take the stand at his peril— might well have been more prudent, as the necessity to rule might have been obviated. Ferreira might have admitted to the nickname, or have elected not to testify, given the uncertainty; other events might have occurred and have materially altered the direction of the case. Even if the need to rule were not altogether obviated, the ruling when it came would have been informed by more concrete circumstances. The court did rule, however—doubtless because it felt this to be the fairest course—and its ruling indicated that Ferreira, instead of being invulnerable to the use of the suppressed statement, as he expected, would be decidedly vulnerable.

---

4. In *Portash,* the Supreme Court accepted review in part in deference to the fact that New Jersey did not require a defendant to take the stand in order to preserve his right to contest an advance ruling. It did not decide "whether

it would regard the constitutional issue as having been properly presented if [*Portash*] had arisen in federal court." —— U.S. at —— n.2, 99 S.Ct. at 1299 n.2 (Powell, J., concurring).

We must, therefore, consider the correctness of the advance ruling. Should the court have indicated that, in these circumstances, the suppressed statement could be used to impeach?

The Supreme Court first addressed the use of suppressed evidence to impeach a defendant in *Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). In that case, Agnello—accused of a drug-related conspiracy—testified in his own defense but said nothing about a can of cocaine discovered in his house pursuant to an illegal search. *Id.* at 35, 46 S.Ct. 4. On cross-examination, he said that he had never seen narcotics, whereupon the prosecution introduced the can of cocaine. *Id.* at 29–30, 46 S.Ct. 4. The admission of this evidence was held to be error, as Agnello in his direct testimony had done "nothing to waive his constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained [in] the search." *Id.* at 35, 46 S.Ct. at 7.

Since *Agnello,* the Supreme Court has held that suppressed evidence may be used to impeach a defendant who, in his *direct* examination, testifies contrary to such evidence—whether the evidence bears on collateral matters, *Walder v. United States,* 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503 (1954), or on matters directly related to the crime charged, *Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Oregon v. Haas,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). The rationale behind this rule is that a defendant's right to take the stand carries with it an obligation to speak truthfully, *Harris,* 401 U.S. at 225, 91 S.Ct. 643, and that, "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense . . . ." *Id.* at 226, 91 S.Ct. at 646.

The courts that have considered the question have held that *Harris* did not undermine *Agnello* with respect to matters elicited on cross-examination, and that suppressed evidence may be used to impeach a defendant only as to statements volunteered in his direct testimony. *United States v. Whitson,* 587 F.2d 948 (9th Cir. 1978); *United States v. Moss,* 562 F.2d 155, 164–65 (2d Cir. 1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); *United States v. Mariani,* 539 F.2d 915, 921–24 (2d Cir. 1976); *United States v. Trejo,* 501 F.2d 138, 145 (9th Cir. 1974); *State v. Kidd,* 281 Md. 32, 375 A.2d 1105, 1114, *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977); *People v. Taylor,* 8 Cal.3d 174, 104 Cal.Rptr. 350, 501 P.2d 918 (1972), *cert. denied,* 414 U.S. 863, 94 S.Ct. 35, 38 L.Ed.2d 83 (1973); *People v. Rahming,* 26 N.Y.2d 411, 311 N.Y.S.2d 292, 259 N.E.2d 727, 731–32 (1970). This interpretation is also supported by at least one commentary. J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 607[09], at 607–90 (1978).

 At least without further guidance from the Supreme Court, we feel bound to join these courts in holding that suppressed evidence may not be used to impeach statements elicited from a defendant on cross-examination, where the defendant has not testified as to the subject matter of the suppressed evidence in his direct examination. As we interpret the district court to have ruled that it would have allowed the suppressed statement to be used to impeach Ferreira, even if he did not discuss nicknames or aliases on direct, and as Ferreira declined to testify in reliance on that erroneous ruling, a new trial must be held.[5]

The foregoing analysis may seem artificial, to be sure. It can be criticized as allowing a defendant to lie safely on cross-examination but not on direct. But it is the rule that best reconciles *Agnello* with the *Harris* line of authority, and it is a reasonable way to minimize any incentive for the government to secure evidence illegally, *see Trejo,* 501 F.2d at 145. Illegal evidence should not be a trump card to keep a defendant off the witness stand altogether or to manipulate his testimony. *See Whitson,*

---

5. The government has not suggested that the court's ruling did not in fact cause Ferreira not to testify; nor has it argued that the ruling, as we have interpreted it, could have been harmless error. Given the decision that hinged on it, we see no basis for holding that it was.

587 F.2d at 952. The situation is different when a defendant boldly contradicts the suppressed evidence in his direct examination. Then it is the defendant who takes the initiative in raising the issue to which the evidence relates. A defendant, in short, may use *Miranda*—or other rules that lead to the exclusion of evidence from the government's case-in-chief—as a "shield," but not as "sword." *See Harris,* 401 U.S. at 226, 91 S.Ct. 643.

### III.

Ferreira asserts that six additional errors were made by the district court. We discuss these insofar as the same issues may arise at a new trial.

■ The court allowed a government witness to testify that two hairs taken from a ski mask and sweater found in the getaway car "could have" been Ferreira's, as well as that one hair taken from the mask was not Ferreira's. Ferreira argues that this evidence should have been excluded, on the ground that the danger of prejudice resulting from its admission outweighed its probative value. *See* Fed.R.Evid. 403. We disagree. It was brought out by the witness that hair identifications, unlike fingerprint identifications, do not point to just one individual as the source. The jury was made well aware of the limitations of this evidence. On the other hand, the link between the sweater and mask and the robbery was strong, and the similarity of the hairs, while not affirmatively implicating Ferreira, "enhanced the probability of guilt" and was therefore probative. *See United States v. Eatherton,* 519 F.2d 603, 611 (1st Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975). The court did not abuse its discretion in refusing to exclude it.

■ Ferreira makes four objections to the district court's rulings vis-a-vis McDonough. The first concerns McDonough's appearance before the Grand Jury that indicted Ferreira. McDonough told the Grand Jury that he knew the third man in his apartment only as "Bubba." Several months later, in a meeting with an FBI agent, he made a photo identification of Ferreira as the third man. McDonough was not called before the Grand Jury again; instead, the agent told it that the man McDonough knew as "Bubba" was Ferreira. Based on the use of this hearsay testimony to obtain the indictment of Ferreira, Ferreira asked that the indictment be dismissed.

Ferreira acknowledges that there is no constitutional requirement that a Grand Jury be presented with primary evidence, *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), and does not contend that the Grand Jury was misled or deceived, *see United States v. Oliver,* 570 F.2d 397, 402 (1st Cir. 1978). We see no reason to reverse the district court's decision on this issue.

■ Ferreira's main objection concerning McDonough is that his testimony at trial as to what Lynch told him after "Bubba" and Hickey left his apartment was inadmissible hearsay. The district court admitted this testimony on the ground that Lynch's statements were made in furtherance of a joint venture involving the three robbers. *See* Fed.R.Evid. 801(d)(2)(E); *Krulewitch v. United States,* 336 U.S. 440, 443–44, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *Ottomano v. United States,* 468 F.2d 269, 273 (1st Cir. 1972), *cert. denied,* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973). Ferreira argues, however, that the joint venture between the three robbers terminated when "Bubba" and Hickey left McDonough's apartment. We disagree.

Whether the joint venture between the three robbers continued after "Bubba" and Hickey had left McDonough's apartment depends upon whether the "central criminal purposes of [the] conspiracy" had been attained by the time they left or only later. *See Grunewald v. United States,* 353 U.S. 391, 401, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). Here, the robbers' objective cannot be defined as the narrow one of robbing the Hancock Bank—that act was completed even before the robbers separated. Robbing the bank were merely the means to the

central objective, which was to obtain cash illegally. *See Atkins v. United States,* 307 F.2d 937, 940 (9th Cir. 1962). Essential to this objective was the need to divide the money and to escape with it undetected. The district court could have believed that it was in furtherance of this that the three went directly to McDonough's apartment. They then had to leave as discretely as possible. It would not have done for them to have left the apartment together in the car in which they had arrived. As it was Lynch who owned the car and who know McDonough best, their central objective could be thought to have been served by his staying behind and then leaving the apartment alone; this was part of the execution of the plan. *See Mares v. United States,* 383 F.2d 805, 810 (10th Cir. 1967), *cert. denied,* 394 U.S. 963, 89 S.Ct. ·1314, 22 L.Ed.2d 564 (1969); *United States v. Birnbaum,* 337 F.2d 490, 495 (2d Cir. 1964). In addition, Lynch's statements to McDonough while he waited there could be viewed as in furtherance of the venture. Lynch told McDonough how the three had concealed their identities by wearing ski masks and switching cars, left the bag for him to dispose of, and left him a sum of money in "thanks" for the use of his apartment and his cooperation. These actions clearly were directed at protecting himself and his two partners by placating McDonough, *see United States v. James,* 510 F.2d 546, 549–50 (5th Cir.), *cert. denied,* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975); *Salazar v. United States,* 405 F.2d 74, 74 (9th Cir. 1968), and by inducing him to dispose of the bag and clothing they had used during the robbery. There had been no interruption in the chain of events, *see United States v. Sidman,* 470 F.2d 1158, 1170–71 (9th Cir. 1972), *cert. denied,* 409 U.S. 1127, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *United States v. Moss,* 544 F.2d 954, 957–59 (8th Cir. 1976), *cert. denied,* 429 U.S. 1077, 97 S.Ct. 822, 50 L.Ed.2d 797 (1977); this was not merely a subsequent effort to "cover up" the crime, *see Krulewitch,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790. We hold that the joint venture continued until Lynch left McDonough's apartment and that Lynch's statements to McDonough were made in furtherance thereof. McDonough's testimony recounting Lynch's statements was admissible.

 Ferreira next argues that his cross-examination of McDonough was improperly limited, contending that the trial court refused to allow him to contradict McDonough's denial of drug use, to show other instances in which his apartment had been used as a hideout for robbers, or to show "the actual 'reward'" that McDonough received for his testimony.

The defendants sought to ask McDonough whether he had ever used any drugs; the trial court permitted the question only as to the period from a week before the robbery to the time of trial. This was not an abuse of its discretion. While we would not establish a fixed rule, a week before the robbery was a reasonable time at which to draw a line, on the ground that drug use then might have affected McDonough's perception and hence his credibility, but that prior drug use would have been only remotely—if at all—relevant.

Ferreira was permitted to ask McDonough whether his apartment had been used as a hideout on January 20 and February 14, as well as on February 4, 1977. But when he sought to ask "how many other times" McDonough's apartment had been so used, the court sustained an objection on the ground that the point had already been made. Ferreira now argues that this prejudiced his efforts to impeach McDonough by showing the extent of his criminal connections and that he had great incentive to inform. This argument was not made to the district court, however, and is speculative at best. We find it unpersuasive.

Ferreira also argues that he was prevented from cross-examining McDonough effectively as to the ·"rewards" he received when he became an informant. First, he complains that he was not given a copy of the agreement McDonough signed when he entered the Witness Protection Program. It is not clear from the record that Ferreira made a serious effort to obtain this docu-

ment, and we assume that he will do so should he feel it is necessary to have it on retrial. Second, he objects to the court's refusal to allow as evidence a letter from the United States Attorney indicating that he had no intention of prosecuting McDonough. It was Hickey, however, who unsuccessfully sought to introduce this letter to impeach McDonough's representation that he was not sure whether he would be prosecuted. As the letter may or may not be inconsistent with McDonough's testimony on retrial, we express no opinion as to whether the letter will be admissible or not.

■ Ferreira's final objection as to McDonough is that the court refused to instruct the jury that he was an accomplice and that his in-court identification of Ferreira should be received with caution.

We find no error. Assuming, and this is a close question, that he was an accomplice, see *United States v. Francomano,* 554 F.2d 483, 486 (1st Cir. 1977), the court's obligation was to give an instruction that would caution the jury with respect to the use of his testimony. This obligation was met adequately by the instruction given.[6] *See United States v. Gonzalez,* 491 F.2d 1202, 1207–08 (5th Cir. 1974); *United States v. Wasko,* 473 F.2d 1282, 1285 (7th Cir. 1973); *United States v. House,* 471 F.2d 886 (1st Cir. 1973).

As to instructing the jury to receive McDonough's in-court eyewitness identification of Ferreira with caution, on retrial the court should consider whether such an instruction is appropriate in light of our decision in *United States v. Kavanagh,* 572 F.2d 9, 12–13 (1st Cir. 1978), issued after the trial from which this appeal is brought.

■ Ferreira concedes that his last ground for appeal is a weak one, and we agree. After Ferreira had been arrested, given his *Miranda* warnings and informed of the charges against him, he gratuitously said, "You guys must have been surprised to find the car used in both bank robberies left in the parking lot of the school."[7] This statement was allowed in as evidence at trial over Ferreira's objection. As it is clear that this statement was volunteered by Ferreira, and was not elicited by any question, it was admissible. *See Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## IV.

■ The defendant Hickey argues that his conviction should be reversed for two reasons. The first, that McDonough's testimony as to what Lynch told him after Hickey and "Bubba" left his apartment was inadmissible hearsay, has already been considered in the context of Ferreira's similar objection. We find the contention to be without merit for the reasons already set forth. We find equally little merit in Hickey's second reason, that he was entitled to a mistrial because he and McDonough appeared before the jury flanked by United States Marshals. The Marshals who accompanied Hickey and McDonough were plain-clothed. McDonough entered the courtroom on crutches, and the Marshals merely appeared to be people helping him. Ferreira's attorney made some reference to the Marshals "sitting around" the defendants during his closing remarks, but clearly this did not approach the kind of prejudice warranting a mistrial. *See Dupont v. Hall,* 555 F.2d 15, 17 (1st Cir. 1977). It is common knowledge that security precautions are taken during criminal trials.

6. The trial court gave the following "informant" instruction, rather than the accomplice instruction requested:

"Mr. McDonough stands in the capacity of being an informer. . . . The jury . . gives him the credence I now tell you that you must give.

"The testimony of an informer who provides evidence against a defendant for pay or for immunity from punishment or for personal advantage or vindication must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. "The jury must determine whether the informer's testimony has been affected by his interest or by prejudice against any of the defendants on trial."

7. There had been a prior robbery of the Hancock Bank in which the getaway car had been left in the Braintree High School parking lot. *See United States v. Cleveland, supra,* note 1.

*The conviction of the defendant Hickey is affirmed; the conviction of Ferreira is vacated and the case remanded for a new trial.*