UNITED STATES of America, Appellee,

v.

**Edwin Charles FORTES, Jr., Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Sandra Elaine JEMISON, Defendant, Appellant.**

Nos. 79–1124, 79–1125.

United States Court of Appeals, First Circuit.

Argued Oct. 4, 1979.

Decided April 1, 1980.

---

Wallace W. Sherwood, Boston, Mass., by appointment of the Court, with whom Bruce W. Carroll, Boston, Mass., was on brief, for defendant, appellant Edwin Charles Fortes, Jr.

Peter M. Lauriat, Boston, Mass., by appointment of the Court, with whom Herrick & Smith, Boston, Mass., was on brief, for defendant, appellant Sandra Elaine Jemison.

Robert B. Collings, First Asst. U. S. Atty., Chief, Criminal Division, Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and BONSAL,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Following a jury trial in the District Court for the District of Massachusetts appellants Fortes and Jemison were convicted of armed robbery under 18 U.S.C. § 2113(d). Each appeals on a variety of grounds. We affirm the convictions.

On March 23, 1978, two individuals robbed the Tri-Town Mall branch of the Hancock Bank and Trust Company of $3,173. Eyewitnesses testified that the two participants were wearing camouflage jump suits and dark ski masks; detailed description or positive identification was not available. The eyewitnesses agreed, however, that there was a difference in height between the two robbers; in addition several eyewitnesses thought the taller of the two was a male, the shorter a female.[1] The taller individual carried a sawed-off shotgun, which one witness identified as a pump action type; the other was unarmed. Only the armed participant spoke during the robbery. This individual at first remained in the lobby area of the bank while his partner entered the teller's area carrying what one witness described as a blue canvas-like book bag. Thereafter, the individual holding the weapon pulled out a section of the teller's cage and jumped over the counter into the teller's area, with the other participant now returning to the customer area of the bank. The individual with the shotgun then came from behind the teller's area carrying, in the words of one eyewitness, a grayish-white type bag "under his arm . . . like a football"; one of the bank tellers who witnessed the robbery described this as a bag of coins. At this point the two individuals left the bank and were seen running into the nearby woods. After the robbery, the head teller noticed that $1,000 in dimes was missing from the vault. She testified that these dimes were rolled in green and white striped wrappers and were packaged inside a white cloth bag which had been delivered the previous day by the Federal Reserve. In addition this witness testified that after the robber had fled she observed a so-called dye-pack security device lying on the bank floor.

In order to link Fortes and Jemison with this robbery, the government relied heavily on the testimony of Anton Ward, who at the time of trial was serving a three-year prison sentence for conspiracy to commit bank robbery imposed by the United States District Court for the District of Connecticut. Ward testified at length as to his relationship and activities with the appellants between December 1977 and early April 1978. He said that on two occasions prior to the March robbery, Fortes, with Jemison present, showed him various weapons, including a 12-gauge pump action sawed-off shotgun. In addition, Ward stated that on these occasions Fortes also displayed boots, ski hoods, pink or flesh-colored plastic masks and coveralls. Ward further testified that on March 24, 1978, the day following the robbery, Fortes and Jemison arrived in Connecticut, and that while helping them unload the trunk of their car, he noticed a blue bag which was quite heavy. Fortes, according to Ward, invited him to look in the bag; Ward complied, noticing rolls of dimes in green and white wrappers. Fortes, in response to Ward's inquiries, indicated he had about $200 there.

---

* Of the Southern District of New York, sitting by designation.

1. There was likewise no positive determination of the race of the two individuals. For example, one witness expressed his belief that the robbers were black; another testified that they appeared to be white; one witness who was unable to indicate the race of the two individuals testified that the taller of the two was wearing a white plastic mask under a blue ski mask. In fact, both Fortes and Jemison are black; Fortes is male and Jemison female; Fortes is 6'2", Jemison 5'6½".

Ward testified that he and a companion—Beverly Brookshire (Fortes' mother)—later took $30 of these dimes and exchanged them for "dollar money," returning the paper currency to Fortes.

Ward testified that on the day following appellants' arrival in Connecticut, he asked Fortes and Jemison "if they did a bank robbery." Fortes answered that they had, describing the details of the robbery, including the facts that Fortes had held the shotgun during the robbery while Jemison took the money; that Jemison had a hard time separating the "red money" from the "regular money"; that Fortes had grabbed a thousand dollars in dimes; that Fortes ran from the bank carrying the dimes like a football; and that Fortes left the area in a station wagon. Fortes later showed Ward a brown LTD station wagon parked in Hartford, Connecticut, which Fortes explained had been rented by a friend and driven down from Boston.

Other testimony of Ward further implicated the appellants in the robbery. Ward testified that on April 7, 1978, some two weeks after the robbery, Jemison emptied a car ashtray filled with dime wrappers into a storm drain at the end of the parking area in front of Ward's apartment. The government later introduced fragments of green and white paper that had been recovered by FBI agent Richard Foster from a storm drain located on the side of the carport and driveway serving that apartment. Ward also testified that Jemison was asked by Beverly Brookshire why so little money was taken during the robbery. According to Ward, Jemison responded that her nervousness and the fact that she had to separate the "red money" explained the relatively small haul. Fortes later indicated that about $3,000 had been taken.

Besides the foregoing, the government presented certain additional evidence including weapons, masks, and other physical evidence seized from a stolen Ford LTD station wagon linked with Fortes and Ward. This evidence, as well as further testimony introduced against the appellants, is described at greater length in our discussion of the various issues raised on appeal.

The defense was based largely on alibi testimony given by Jemison, her mother, and her aunt. In addition to denying that she or Fortes had been present at or participated in the bank robbery, Jemison described her encounters with Anton Ward and her relationship with Fortes and Beverly Brookshire during the period from December 1977 to April 1978. Jemison said that Ward displayed various weapons in front of her in December 1977. And, she continued, Ward stole a blue bag from a sporting goods shop sometime in early March of 1978; the next time she saw this bag was on March 29 when Ward took it, full of dimes, from his apartment to his car. Ward then exchanged a quantity of these dimes into currency, using the proceeds to take Jemison and Beverly Brookshire shopping and to dinner in Hartford. Jemison further contradicted Ward's version of events by testifying that it was Brookshire, not she, who emptied the contents of the automobile ashtray in the vicinity of Ward's Connecticut apartment. Jemison concluded her testimony by firmly denying that she had participated in the March 23 robbery. Fortes did not take the stand.

## I.

Fortes challenges the district court's denial of his motion to suppress as evidence certain items seized from a brown Ford LTD station wagon and a footlocker found in the rear part of that vehicle. The station wagon, which federal officials knew had been stolen from a rental agency, was seized without a warrant from an apartment parking lot in Hartford, Connecticut by those officials on April 7, 1978. The vehicle and footlocker were searched pursuant to a warrant on April 10.[2] Among the items recovered from the footlocker were a sawed-off Remington Model 870 12-gauge shotgun, two handguns, three black ski hoods, three plastic masks, two blue nylon

---

**2.** The owner of the station wagon consented to its search.

bags, and a pair of size seven women's track shoes. A small box containing a comb was also discovered in the glove compartment of the LTD. During the trial, the government introduced evidence that Fortes' fingerprints had been found on that box and that the track shoes found in the footlocker fit Jemison. The government also introduced as evidence one of the blue nylon bags; this was identified by a bank teller as "the same type of bag" carried by one of the participants in the robbery. In addition, the government introduced into evidence the Remington shotgun. At trial, one witness, a bank teller, testified that this resembled the weapon held by the taller individual throughout the robbery. Another witness, a bank customer present during the holdup, first testified that the shotgun used during the incident "was a Remington Model 870, with a sawed-off barrel," and expressed the opinion that the shotgun seized during the vehicle and footlocker search was "basically the same model."

Fortes, in challenging the district court's denial of his suppression motion, focuses on the search of the footlocker, contending that "the warrant application for the footlocker was defective as it failed to show a substantial basis for the conclusion that the items sought would be found inside the footlocker." Upon reviewing the affidavit filed by Special Agent Richard Foster of the FBI in support of his application for the search warrant, we find little strength in this contention. The affidavit, framed largely in terms of the affiant's personal observations, indicated among other things that the Ford LTD station wagon had been rented March 20, 1978 and reported stolen on April 7, nearly one week after it was due to be returned to the rental agency; that on April 6, 1978 the same vehicle was observed "being used . . . to 'case' the Cromwell Savings Bank, Cromwell, Connecticut"; and that on April 7 Fortes and Ward were observed driving the station wagon to Hartford, Connecticut where it was abandoned and later recovered and towed by federal officials to the Federal Building garage. The affidavit further stated that a reliable confidential informant

had named Fortes as one of the participants in a February 1978 robbery of a Berlin, Connecticut bank. The affidavit also indicated that a "CB" radio identical to one previously stolen along with a 1977 Dodge Charger was "visible on the floor of the passenger side front" of the Ford LTD and that the same stolen Dodge Charger had been used as an escape vehicle in the February Berlin robbery. The affidavit stated that various listed items, including two handguns, a sawed-off pump action shotgun, ski masks, face masks and coveralls had been depicted in photographs taken by bank surveillance cameras during the Berlin robbery and another earlier Connecticut robbery described in the affidavit. The affidavit concluded with an expression of the affiant's belief, based upon the above information, that the listed items and other incriminating evidence were presently being concealed in the Ford station wagon and the footlocker located in the back of that vehicle.

■■■ Prior to issuing the warrant the magistrate was thus presented with information that during the period immediately preceding its seizure the stolen Ford LTD had been used to "case" a bank and had been driven and abandoned by an individual reliably identified as having participated in a recent robbery of a Berlin, Connecticut savings bank. Further, the affidavit linked the Ford station wagon through physical evidence, the stolen CB radio, with another stolen vehicle that had been used as a means of escape in the Berlin robbery. The affidavit then went on to identify, in detail, paraphernalia used in both the Berlin robbery and another earlier Connecticut robbery. We believe that, considering the "type of crime, the nature of the [described] items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide [such] property," *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970), the above information supplied the magistrate with reasonable cause to suspect that the robbery paraphernalia would be found somewhere in the stolen Ford station wag-

on. *Cf. United States v. Samson*, 533 F.2d 721, 723 (1st Cir.), *cert. denied*, 429 U.S. 845, 97 S.Ct. 126, 50 L.Ed.2d 116 (1976); *United States v. Picariello*, 568 F.2d 222, 227 (1st Cir. 1978). And there was no less reason to suspect that a locked footlocker stored in the rear of that stolen vehicle would provide a likely place in which those items used during past robberies might be found. A locked container of that type would be a logical place to conceal such highly incriminating objects. Clearly the magistrate had reasonable cause to believe "that the specific 'things' to be searched for and seized [were] located on the property to which entry [was] sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556, 98 S.Ct. 1970, 1977, 56 L.Ed.2d 525 (1978). We thus think the warrant was validly issued and affirm the district court's denial of Fortes' suppression motion.[3]

## II.

Jemison challenges the district court's admission, against her, of certain statements made by Fortes on two occasions during the days following the robbery. These statements were introduced through the testimony of Anton Ward. Ward testified that Fortes and Jemison arrived in Connecticut on March 24, 1978, the day following the robbery. Ward recounted that while helping appellants unload their car, he noticed in the trunk a blue bag which was quite heavy. Following Fortes' suggestion, Ward looked in the bag and observed rolls of dimes in green and white wrappers. Fortes, in response to Ward's inquiries, purportedly stated that the bag contained "about $200." At the time this testimony was received, the court excluded it as to Jemison, giving it effect only as to Fortes.

Ward continued by testifying about a conversation that he said took place the following day, March 25, in the living room of his apartment. Ward stated that both Fortes and Jemison were present during the conversation. Ward testified that at this time he asked appellants "if they did a bank robbery," and that Fortes answered affirmatively, providing details of the robbery. Fortes' recitation, according to Ward, contained a description of Jemison's participation, including the information that she had taken the bank's money while Fortes held a shotgun and that she had difficulty separating the "red money" from the "regular money." Jemison objected repeatedly to the admission of Fortes' statements against her. These objections were overruled. After Ward completed relating his version of Fortes' description of the bank robbery, the government requested that Ward's earlier testimony concerning the contents of the blue bag be admitted against Jemison. The request was granted.

■ We turn first to Jemison's challenge to the admission against her of Ward's testimony concerning the later March 25 conversation in which Fortes detailed his participation, with Jemison, in the robbery. This testimony was properly received against Jemison under Fed.R.Evid. 801(d)(2)(B), which allows the introduction of so-called adoptive admissions, including admissions by silence or acquiescence. *See* IV Wigmore § 1071 (Chadbourn rev. 1972). The general rule has been stated as follows:

> " 'When a statement tending to incriminate one accused of committing a crime is made in his presence and hearing and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible in a criminal prosecution against him, as evidence of his acquiescence in its truth' * * * if made 'under such circumstances as would warrant the inference that he would naturally have contradicted them if he did not assent to their truth.' "

Nor need we decide whether the footlocker search might have been justified as an inventory search accompanying the lawful seizure of a stolen vehicle. *See South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

---

**3.** As the motion to suppress was properly denied we need not determine whether Fortes had "standing" to challenge the search of the footlocker. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

*Arpan v. United States,* 260 F.2d 649, 655 (8th Cir. 1958) (citations omitted). *See Sparf v. United States,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895).

█ Prior to the admission of Ward's testimony as to Fortes' depiction of the robbery scenario, including his remarks implicating Jemison, the following ensued:

"Q. Directing your attention to the morning hours of [March 25], do you recall having a conversation, sir, with Mr. Fortes and Miss Jemison; yes or no?

A. Yes.

Q. Where did that conversation take place?

A. In the living room downstairs.

Q. And both Miss Jemison and Mr. Fortes were present?

A. Yes, sir.

. . . . .

Q. And at this time, sir, did you say anything to Mr. Fortes and Miss Jemison with respect to the dimes?

A. Yes, sir.

Q. What did you say?

A. I asked them if they did a bank robbery.

Q. Did one of them make a reply?

A. Yes, sir.

Q. Who was that?

A. Fortes.

Q. Was Miss Jemison present at the time he replied?

A. Yes, sir.

Q. What did he say?"

At this point Ward was allowed, over objection, to relate Fortes' description of the robbery which included a description of Jemison's participation therein. The government, at each new turn in the testimony, asked Ward whether Jemison had been present when Fortes made a particular remark detailing Jemison's conduct during the robbery. Ward answered affirmatively each time. Despite these facts, Jemison argues that "there was not sufficient foundation laid for the Court to make a preliminary determination that [the] conversation was admissible against [her] . . . ." We do not agree. First, we have no diffi-

culty in concluding that an inquiry of two persons as to whether they had "done a bank robbery," followed by an affirmative response by one of them describing his participation with the other in the crime, is the type of exchange to which the silence of the unresponsive accomplice, assuming he is present and conscious of the conversation, "gives consent." IV Wigmore § 1071, at 102 (Chadbourn rev. 1972). *See Campbell v. United States,* 269 F.2d 688 (1st Cir. 1959), *vacated on other grounds,* 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428; 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501; *United States v. Schroeder,* 433 F.2d 846 (8th Cir. 1970), *cert. denied,* 401 U.S. 943, 91 S.Ct. 951, 28 L.Ed.2d 224 (1971). Further, sufficient facts were introduced preliminarily to show, by way of foundation, that Jemison heard the statements detailing her conduct in the robbery and comprehended them. *See Campbell, supra* at 690; *United States v. Moore,* 522 F.2d 1068, 1075–76 (9th Cir. 1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976); *Arpan v. United States, supra* at 655. Ward testified several times that Jemison was present during the conversation and implied that he had directed his questions to both Jemison and Fortes, asking "if *they* did a bank robbery." We thus do not have the situation which existed in cases cited by Jemison where no evidence was offered to show that the defendant against whom the statements were introduced had any relation to the conversation in issue, although he might have been somewhere present in the room in which the conversation took place. *See Arpan, supra* at 655–56; *Moore, supra* at 1076. We note also that Jemison failed to object to this line of questioning specifically on the grounds of insufficient foundation, *see* Fed. R.Evid. 103(a)(1); she likewise did not request that the government elicit fuller preliminary information; and on cross-examination of Ward, Jemison did not attempt to rebut the foundation laid by the government as to her presence at the time of the conversation or her ability to hear or understand Fortes' incriminating comments. *Cf. Arpan, supra* at 655; *Orser v. United*

*States,* 362 F.2d 580, 583–84 (5th Cir. 1966). In these circumstances, we find that Fortes' inculpatory remarks, recounted by Ward, were properly admitted against Jemison. The ultimate weight given them was, of course, a matter for the jury. *See Campbell, supra* at 691. *Cf. Arpan, supra* at 655; *Moore, supra* at 1075.

We likewise find no error in the admission against Jemison of Ward's earlier testimony concerning his conversation with Fortes about the contents of the blue bag. While admission of this testimony would scarcely be grounds for reversal even if erroneous, it was properly admitted under Fed.R.Evid. 801(d)(2)(E), which permits the admission against a party of the statements of a joint venturer made during the course of and in furtherance of that venture. *See United States v. Hickey,* 596 F.2d 1082, 1089 (1st Cir. 1979); 11 Moore's Federal Practice § 801.01[7]. The district court, it will be recalled, at first admitted the testimony solely against Fortes. It was allowed against Jemison only after the court had heard Ward's later recitation of Fortes' description of Jemison's joint participation in the robbery. This latter evidence furnished the foundation for a finding of joint enterprise required before Rule 801(d)(2)(E) could come into play. *See United States v. Petrozziello,* 548 F.2d 20 (1st Cir. 1977). Jemison contends, however, that "by the time Fortes spoke to Ward in Connecticut about the contents of the blue bag . . any joint venture had ended." Whether this was so depends upon whether the "criminal purposes of [the] conspiracy" had been attained. *Grunewald v. United States,* 353 U.S. 391, 401–02, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957); *United States v. Hickey, supra* at 1089. In the *Hickey* case, faced with a similar question, we said,

"Here, the robbers' objective cannot be defined as the narrow one of robbing the Hancock Bank—that act was completed even before the robbers separated. Robbing the bank was merely the means to the central objective, which was to obtain cash illegally. *See Atkins v. United States,* 307 F.2d 937, 940 (9th Cir. 1962). Essential to this objective was the need to divide the money and to escape with it undetected. The district court could have believed that it was in furtherance of this that [the defendants] went directly to [the] apartment."

*Id.* at 1090–91.

The evidence in the present case showed that Fortes and Jemison went to Ward's apartment in Connecticut on the day following the robbery, where they took up residence, and stored much of the robbery paraphernalia and loot. Under these circumstances, Fortes' statement to Ward—made upon arrival at the hideaway while Ward helped Fortes unload a bag filled with the stolen rolled dimes prior to their carrying it into the apartment—was in furtherance of a venture that was not yet complete. *See Hickey, supra* at 1090; McCormick on Evidence § 267, at 645 (2d ed. 1972).

Ward was cross-examined extensively by counsel for both Jemison and Fortes on a variety of matters including his conviction for conspiracy to commit bank robbery, his familiarity with weapons, including shotguns, his past ownership of approximately 21 firearms, various prior inconsistent statements, and the termination of his employment as a police officer. During the course of this cross-examination, Ward was asked by counsel for Jemison whether he had ever been involved in the sale of cocaine. The government objected, and at a bench conference Jemison's attorney made an offer of proof in which he explained that he wished to introduce evidence of such conduct as a "prior bad act" impeaching Ward's credibility. The district court refused to allow this line of questioning. Further along in cross-examination, counsel for Fortes questioned Ward concerning his former employment as a police officer and the fact that he had been fired from the department. Ward was asked whether he had told the truth to investigating officers concerning the incident which led to his firing. The government's objection to this question was likewise sustained.

**118**

Fortes and Jemison contend that the district court's evidentiary rulings unduly hampered their ability to effectively cross-examine Ward, a witness whose testimony on direct was central to the government's case. They point to Fed.R.Evid. 608(b) in support of their position. That rule provides:

"(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

The district court's discretion under this Rule is—while not unlimited, *see Wiseman v. Reposa,* 463 F.2d 226 (1st Cir. 1972)—very substantial. *United States v. Nogueira,* 585 F.2d 23 (1st Cir. 1978); *see also Tigges v. Cataldo,* 611 F.2d 936 (1st Cir. 1979). Rule 608(b) has been worded specifically to emphasize the discretionary power of the trial judge. 3 Weinstein's Evidence, Weinstein and Berger ¶ 608[05], at 608–23; Report on Rule 608 by the House Committee on the Judiciary.

█ In refusing to allow cross-examination concerning Ward's possible involvement in the sale of cocaine, the district court observed that selling cocaine was not probative of truthfulness or untruthfulness; this necessary precondition to admissibility under Rule 608 having not been met, the court refused the proffered testimony. That ruling was plainly within the bounds of the court's discretion. Whether and in what circumstances involvement in a drug transaction might ever be considered probative of a witness' veracity is a matter we need not pursue.

█ The attempt to cross-examine Ward as to his truthfulness in responding to investigators probing the incident surrounding his discharge as a police officer stands on a somewhat different footing. A witness' response to a question whether he told the truth on a previous occasion could well be probative of his character for truthfulness or untruthfulness. *Cf. Tigges, supra,* at 939 n.3. And, when a case turns to a large extent on the credibility of defendant's accuser, broad cross-examination of that principal witness should be allowed. *See Nogueira, supra* at 26. Still, the district court is not bound to allow examination into every incident, no matter how remote in time and circumstance, that may possibly bear upon the witness' veracity. *Id.* at 25. In reviewing the trial judge's exercise of discretion, one factor to be considered is the extent to which the excluded question bears upon character traits that were otherwise sufficiently explored. The court need not permit unending excursions into each and every matter touching upon veracity if a reasonably complete picture has already been developed.

█ In the present case, the district court allowed extensive inquiry by the defense into Ward's past conduct and statements insofar as these might bear upon his character for truthfulness. He was shown to have been presently serving a jail sentence for conspiracy to commit bank robbery, and the jury was presented with much else indicating his unreliable character and questionable trustworthiness. Allowing further inquiry into the matter in question would thus have added little to what was already evident. We accordingly find no abuse in the court's refusal to permit the proposed cross-examination.

Fortes and Jemison next challenge the district court's refusal, in two instances, to limit the scope of the government's inquiry into certain of their activities during the period following the robbery. Basically, their contention is that by allowing these inquiries the government improperly presented evidence of unrelated criminal conduct to the jury and thus, in effect, put

appellants' bad character in issue contrary to Rule 404 of the Federal Rules of Evidence.

Appellants' first challenge concerns the testimony of Special Agent Richard Foster of the FBI. Foster testified as to his observations of Fortes, Jemison, Ward and Brookshire during the early days of April 1978. Specifically, he recounted the activities of those individuals in order to lay a foundation linking appellants to the brown Ford LTD station wagon later seized and searched by federal officials. It will be recalled that several incriminating items were recovered from that vehicle. Appellants maintain that as "it is common knowledge that the FBI would not have placed the defendants under surveillance unless it believed these individuals were committing or about to commit a crime," this testimony allowed the government to imply that the appellants were involved in some sort of criminal activity not the subject of the present trial. The district court, in rejecting a similar contention raised at trial, observed, "I don't see how you can draw that conclusion, from [the evidence presented] . . . What triggered the F.B.I.'s involvement . . . we don't know." We are in agreement with the district court. The government did not question Foster in a manner which might have suggested that Fortes and Jemison were involved in any unrelated illegal activities. Nor did Agent Foster's responses contain any suggestion that the appellants were placed under FBI surveillance because of their involvement in a criminal enterprise other than the one with which they were charged in the present case. The testimony given by Foster was relevant to show appellants' connection with a vehicle from which robbery paraphernalia was recovered and also to corroborate certain testimony given earlier by Anton Ward. The government confined its inquiry within permissible bounds, and the trial court's refusal to further limit that questioning was a proper exercise · of its discretion. *See* Fed.R.Evid. 402, 403.

Appellants similarly challenge the sweep of the prosecution's cross-examination of Jemison, who took the stand after the defense had presented its chief alibi witnesses. Jemison, on direct examination, had repeated the substance of that alibi testimony, and then detailed her relationship with Fortes, Ward, and Beverly Brookshire during the period from December 1977 through early April 1978. Jemison recounted that Ward, while visiting her apartment, once displayed to her two pistols and "a lot of ammunition." Jemison testified that Fortes was present at this time. In addition, Jemison testified that Ward had stolen from a ski shop the blue bag introduced by the government and identified by a bank teller as the same type used by a participant in the robbery. Again, Jemison recalled that Fortes had been present on this occasion. Jemison further testified that the next time she saw this blue bag was during the last week in March when Ward took it, full of rolled dimes, from his apartment; Jemison later accompanied Ward while he exchanged a quantity of these dimes for paper currency. In fact Jemison recounted that Ward used some of this currency to treat her and Beverly Brookshire to shopping, dinner and drinks. Jemison continued her testimony by recalling various events occurring during the first week of April 1978—for example, that she, Fortes, Ward and Brookshire "went to the movies" one night. More importantly, Jemison also testified that on April 6 Ward placed the blue bag in a larger, nylon bag and that on April 7, Ward transferred that bag into a footlocker located in the rear of a brown Ford LTD station wagon. Jemison testified that she and Fortes were both present when this transfer took place.

On cross-examination, the government delved more fully into some of the events described by Jemison during her direct testimony. In answer to the government's questions, Jemison explained that during a January 1978 visit to Ward's apartment he showed her, with Fortes present, three shotguns, a bulletproof vest and some pistols. Jemison recognized one of these pistols as the same handgun earlier displayed during Ward's visit to her apartment. Jemison also further detailed Ward's theft of the

blue bag from the ski shop, and the frequent contact she and Fortes had with Ward during the period in question. On one occasion, Jemison testified, she allowed Ward the use of her apartment for two weeks. Jemison also testified that on March 25, 1978 (two days following the robbery) she and Fortes moved to Connecticut, and that they planned to stay with Ward at his Middletown apartment indefinitely. Jemison further recalled that at the end of March, Fortes made a trip from Middletown back to Boston in order, among other reasons, "to pick up some marihuana."

The government, continuing its cross-examination, questioned Jemison in detail as to her activities on April 5, 1978, specifically probing her knowledge concerning the retrieval of a station wagon from a parking lot in West Hartford, Connecticut. Jemison stated that prior to that incident she, Fortes, Brookshire and Ward had first proceeded to a different parking lot. Jemison was asked to recount what had transpired there. Counsel for both Fortes and Jemison objected, and at a bench conference Jemison's attorney stated, "I believe . . there is going to be testimony about a car being stolen in the second parking lot . . . ." After hearing argument, the court determined that the government could continue its inquiry, observing, "[W]e've covered, on direct examination, the comings and goings, and what she did, what she was doing, and all the rest of it, during an extended period in December of '77 through April, and I think the government is entitled to pursue what she was doing in the company of these people, what their relationships were. If in the course of it, they stole the car, it's too bad."

The government then questioned Jemison as follows:

"Q. What was your purpose in going to Hartford?

A. Because Anton wanted to steal a car.

Q. Who wanted to steal a car?

A. Anton Ward.

Q. You knew that before you left?

A. Yes, sir, I did."

After this Jemison detailed the car theft, describing how Ward, carrying what was "most likely" a tool set, and Fortes approached the vehicle, entered it, started it and drove away.

Jemison and Fortes contend that by allowing this testimony the district court committed prejudicial error. Appellants assert that the introduction of evidence of the car theft put their character in issue contrary to the guidelines of Fed.R.Evid. 404 and that whatever probative value the evidence might have had was far outweighed by its prejudicial effect.[4]

We begin by considering the propriety of admitting this testimony against Jemison and stating the familiar proposition that evidence otherwise relevant is not rendered inadmissible merely because its tendency is to prove the commission of some other crime. *United States v. Eatherton*, 519 F.2d 603, 611 (1st Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975). "The test of admissibility requires balancing the prejudicial potential of the evidence against its probative value, and that task is committed primarily to the trial court." *Id.* Here, we find no abuse. Jemison on direct examination testified extensively as to her activities and relationships with Fortes, Ward and Brookshire during December 1977 to April 1978. She recalled specifically various events occurring during the first week of April, a period during which dimes were exchanged and robbery implements transported, the same period in which the car theft occurred. The import of her testimony was that she had been a bystander of sorts, while Ward, by displaying weapons, exchanging dimes and concealing and transferring items possibly used in the robbery, was the active

---

4. Appellants similarly contend that the district court erroneously allowed the government to inquire into appellants' activities on April 6, 1978 which included the "casing of a bank." We have carefully reviewed the relevant tran-script sections and find no meaningful suggestion from the government's questions or Jemison's responses that appellants were involved in such an activity.

participant. Indeed, drawing in part upon this picture, it was the theory of the defense that Anton Ward (with an accomplice) and not defendants had robbed the bank.

To deny the government the leeway to fully develop the true nature of Jemison's relationships and participation would be to deprive it of the opportunity to use cross-examination in its most traditional role. *See* V Wigmore § 1368, at 36–37 (Chadbourn rev. 1974). Having raised as a subject the events of the first half of 1978 and having described her own part in those events in rather passive terms, Jemison opened the door to a full and not just a selective discussion of these matters. *Cf. United States v. Helina*, 549 F.2d 713, 719 (9th Cir. 1977); *United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975); *Hood v. United States*, 365 F.2d 949, 951–52 (D.C. Cir.1966). Facing a similar question, the Second Circuit noted that where a defendant, on direct, offers various "protestations of innocent friendship" with a co-defendant, "[c]ertainly some leeway must be accorded the prosecution in offsetting the effect of [that] original testimony . . . ." *United States v. Novick*, 124 F.2d 107, 109 (2d Cir. 1941), *cert. denied*, 315 U.S. 813, 62 S.Ct. 795, 86 L.Ed. 1212 (1942). *See also Gilbert v. United States*, 366 F.2d 923, 950 (9th Cir. 1966), *cert. denied*, 388 U.S. 922, 87 S.Ct. 2123, 18 L.Ed.2d 1370 (1967). The government was entitled to have Jemison complete the picture she had begun on direct. We find no error in the admission of this evidence against her.[5]

As to Fortes, the introduction of the evidence of his participation in the car theft presents a more difficult question. Fortes did not take the stand; unlike Jemison he made no attempt to describe his activities during this period or to detail his relationship with the various parties involved in these events. The effect of Jemison's re-counting of Fortes' participation in the theft of an automobile was to place evidence of Fortes' "bad character" before the jury in circumstances where it did not fall within one of "several well-circumscribed exceptions." *United States v. Fosher*, 568 F.2d 207, 212 (1st Cir. 1978). *See* Fed.R. Evid. 404(b). Even assuming that the disputed evidence was somewhat relevant on the issue of Fortes' relationship with Ward and Jemison, its probative force was too slight to counterbalance the prejudice caused by suggesting to the jury that because Fortes committed some crime, it was likely that he also committed the crime for which he was being tried. *Fosher, supra* at 212.

While this evidence was thus inadmissible as to Fortes, the error in admitting it was harmless. We observe, first, that the government's case against Fortes was very strong. Not only had Ward's testimony developed Fortes' participation in the robbery, his possession of weapons and robbery paraphernalia, and his concealment of those implements, but there was also significant corroboration. A government witness, May Smith, testified that Fortes called her in late March of 1978 seeking assistance in exchanging a quantity of rolled dimes for currency. She further testified that Fortes contacted her again several months later in order to ensure that their stories to investigating FBI agents would coincide. The government also introduced evidence that Fortes' fingerprints were found on an item recovered from the LTD station wagon in which a cache of weapons and robbery implements had been stored.

Second, and even more importantly, Fortes' association with other illegal or suspect activities beyond the robbery for which he was on trial was developed without objection in the course of Jemison's testimony. Jemison testified that Fortes was present at the time Ward stole some merchandise from

---

5. Jemison's testimony concerning the car theft was not especially prejudicial as to her. She had already indicated her involvement in a series of other illegal activities, and portrayed her role as rather passive—that while Ward displayed weapons, stole merchandise, concealed robbery implements, etc., she remained somewhat of a bystander. Her testimony on the theft of the vehicle painted nearly an identical picture. She again presented herself as a nonparticipating observer to one of Ward's illegal enterprises.

a sporting goods shop and when Ward transferred the large nylon bag into the Ford LTD station wagon. Jemison recounted that Fortes, on one occasion, left Connecticut to return to Boston in order to pick up some marijuana; Ward, she said, supplied the money for this transaction. Jemison also testified that Fortes was present at her apartment when Ward displayed two handguns; Fortes was likewise there when Ward, at his apartment, revealed three shotguns, two pistols and a bulletproof vest. And the evidence further indicated that despite the fact that they were thus clearly aware of what Jemison portrayed as Ward's criminal inclinations, Fortes and Jemison made no attempt to disassociate themselves from him, and in fact visited him frequently, accompanied him often, and decided to move in with him indefinitely. In light of the foregoing, Jemison's recounting of the car theft incident, which Ward supposedly initiated, and Fortes aided and abetted, could have done little more than confirm a picture already on display portraying Ward as a leader in illegal activity, and Fortes and, to a somewhat lesser degree, Jemison herself, as willing dupes and accomplices. Given this state of the evidence, and the force of the government's case, we cannot see that the car theft episode affected the outcome. We therefore find the error in admitting that testimony harmless. *See United States v. Bosch,* 584 F.2d 1113, 1117 (1st Cir. 1978) (nonconstitutional error such as erroneous admission of similar act evidence is harmless if it is "highly probable" that error did not contribute to the verdict).

▉ Fortes and Jemison challenge one further evidentiary ruling by the district court. They contend that the court erred by admitting into evidence "certain fragments of white paper with green printing, apparently pieces of dime wrappers" which were recovered by FBI agents from a storm drain located a few feet from the front door of Anton Ward's Connecticut apartment. At the time the government sought to introduce these fragments, evidence had already been presented indicating that $1,000 in dimes was taken during the robbery at the Hancock Bank and Trust and that these dimes were rolled in green and white wrappers issued by the Federal Reserve System. In addition, Ward had testified as to appellants' arrival in Connecticut the day following the robbery with a blue bag filled with rolled dimes in green and white wrappers; he had further recounted that Jemison later emptied a car ashtray filled with the same sort of dime wrappers into a storm drain at the end of the parking area serving Ward's apartment. Based on the above foundational facts, the relevance of the paper fragments proffered by the government is more than clear, and the trial court's acceptance of this evidence entirely proper. *See* Fed.R.Evid. 402, 403; *United States v. Cepulonis,* 530 F.2d 238, 246 (1st Cir.), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834; 426 U.S. 922, 96 S.Ct. 2630, 49 L.Ed.2d 376 (1976). Appellants' argument, stressing that the fragments were not directly tied to the Hancock Bank and that the government did not demonstrate through scientific tests the origin of those fragments, goes to the weight to be given the evidence, not its admissibility. *See generally* I Wigmore § 29 (3d ed.); McCormick on Evidence, § 185 at 438 n.26 (2d ed. 1972). We thus discern no error.

### III.

▉ We turn next to Jemison's contention that the denial by the district court of her motion for judgment of acquittal was error. In assessing the correctness of such a denial, we must, of course, view the evidence considered as a whole, including all inferences that may be reasonably drawn therefrom, in the light most favorable to the government. *United States v. Indelicato,* 611 F.2d 376 at 384 (1st Cir. 1979). We must then determine whether a reasonable person so viewing the evidence could find guilt beyond a reasonable doubt. *Indelicato, supra; Villarreal Corro v. United States,* 516 F.2d 137, 140 (1st Cir. 1975). Considering the breadth of the evidence introduced, in particular Ward's testimony implicating Jemison in the robbery (such testimony including a statement by Jemison

herself as to her own role), and our affirmance of the evidentiary rulings challenged by Jemison, we find ample evidence to support the court's refusal to grant the motion for judgment of acquittal.

### IV.

Fortes and Jemison challenge in several respects the district court's jury charge, first focusing on the court's instruction on their alibi witnesses and defense. Although refusing to adopt the precise instruction requested by appellants, the court charged the jury as follows:

> "Now with respect to the alibi testimony, that is, the testimony of the aunt, mere disbelief of that testimony, is not positive evidence of guilt. You have to balance all of these things out. If you don't believe that testimony, it certainly has something to say about how you are going to deal with other testimony. But in the absence of testimony, any other testimony that persuades you beyond a reasonable doubt of the defendant's guilt, you cannot base defendant's guilt upon disbelief of the alibi testimony. It's a tough distinction.
>
> "If you disbelieve the alibi testimony, it may affect the value you give to other testimony, but there has to be some other testimony sufficient to persuade you beyond a reasonable doubt of the defendant's guilt, that is, testimony which you believe. Obviously there is testimony, but the question is: Do you believe it? Do you accept it?"

Following the completion of the jury charge, the appellants objected, see Fed.R. Crim.P. 30, and counsel for Jemison requested that the court instruct the jury that "[t]he burden of proof [remains] with the government even if the alibi witness is disbelieved." The court after reviewing the alibi instruction already given refused to

re-instruct the jury on that point, observing "I think it covered it."

 Courts have indeed cautioned that alibi instructions should contain adequate safeguards against jury confusion and should indicate that the burden of proof remains on the government despite disbelief of the alibi witnesses. *Wright v. Smith*, 569 F.2d 1188 (2d Cir. 1978); *United States v. Burse*, 531 F.2d 1151 (2d Cir. 1976); *United States v. Booz*, 451 F.2d 719 (3d Cir. 1971). While declining a per se rule, we agree that in some cases it may be important for the court, upon request, to give suitable instructions along these lines.[6] Any such duty here, however, was amply discharged. The court specifically explained to the jury in the present case that "mere disbelief of [the alibi testimony], is not positive evidence of guilt." It continued by noting that "in the absence of testimony that persuades you beyond a reasonable doubt of the defendant's guilt, you cannot base the defendant's guilt upon disbelief of the alibi testimony." Finally, it stated "[i]f you disbelieve that alibi testimony, it may affect the value you give to other testimony, but there has to be some testimony sufficient to persuade you beyond a reasonable doubt of the defendant's guilt. . . ."

 While the instruction did not explicitly state that the burden remains on the government despite disbelief of the alibi testimony, that message was sufficiently conveyed, particularly when this instruction is considered in the context of the overall charge. *See Cupp v. Naughton*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *United States v. Harrigan*, 586 F.2d 860, 863 (1st Cir. 1978). Prior to the alibi instruction, the court had informed the jury that "the defendants are presumed innocent until their guilt is established beyond a reasonable doubt on the basis of the evidence which has been admitted"; that

---

**6.** We note that there are occasions where the failure of the alibi defense may properly give rise to affirmative evidence of guilt, *e. g.*, if on taking the stand the accused engages in "an obvious fabrication [that] could only have been adopted to cover his criminal participation." *United States v. Cowden*, 545 F.2d 257, 264 (1st Cir. 1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). There is no universal principle that the only evidence a jury may consider as probative of guilt is that which forms part of the prosecution's case-in-chief. The defense itself may sometimes unwittingly fill in the holes in the government's case.

"the burden in this trial, as in every criminal trial is upon the government to establish the guilt of the defendant by proof beyond a reasonable doubt"; and that "this burden must be sustained with respect to the evidence as a whole and with respect to every material element of the crime charged . . . ." In addition, the jury was warned that if after careful deliberation it had a reasonable doubt as to a defendant's guilt it must find that defendant not guilty. While general instructions as to the government's burden of proof interspliced throughout the entire charge might not cure an incorrect, confusing or grossly inadequate alibi instruction, see *United States v. Booz, supra* at 723, the court's alibi instruction given here more than sufficiently cautioned the jurors that mere disbelief of the alibi defense was not positive evidence of appellants' guilt. The jury could have no reason to suppose that the burden of proof had shifted. There was no error.

Fortes and Jemison also cite as error the court's failure to give a so-called informant or accomplice instruction indicating that the testimony of such witnesses is inherently suspect and should be received with caution. The basis for the court's refusal to grant appellants' request was its belief that on the evidence presented the government's witness, Anton Ward, had not been shown to be either an accomplice in the crime charged or an informant.

▇ At the close of the jury charge, the district court invited counsel to advise it of any errors or omissions in the instructions given. Counsel for the appellants did not, however, then challenge the court's failure to give the requested accomplice or informant instruction and therefore waived any objection. *United States v. Barrett,* 539 F.2d 244, 249 (1st Cir. 1976). *See* Fed.R.Crim.P. 30. We are thus unable to now consider this argument unless we find plain error. Fed.R.Crim.P. 52(b).

In *United States v. House,* 471 F.2d 886, 888 (1st Cir. 1973), we called to the attention of the district courts in this circuit "the prudence of giving, whether requested or not, cautionary instructions where the government predominantly relies on informants or accomplices." However, we there refused to adopt an error per se rule and declined to find plain error for failure to give an unrequested cautionary instruction where the government's case largely depends on uncorroborated informant or accomplice testimony, so long as such testimony "looks internally consistent and credible." *Id.* at 888–89. More recently, we reaffirmed our position in *House* and held that "[t]hough it is prudent for the court to give [an accomplice] instruction, even when one is not requested, failure to do so is not automatic error especially where the testimony is not incredible or otherwise insubstantial on its face." *United States v. Wright,* 573 F.2d 681, 685 (1st Cir.), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978).

▇ Ward's testimony was both consistent and credible. Aspects of it were corroborated by other witnesses. Beyond that, the jury was informed both of Ward's conviction for conspiracy to commit bank robbery and of a good part of his unsavory recent history. It was instructed it might "consider bias or prejudice" and "motive for lying" and that "the credibility of witness may be impeached . . . by showing conviction of a crime." It is most unlikely that the instruction, if given, would have made any difference. Moreover, as the district court noted, it is even unclear that Ward was an informant or accomplice in the crime charged.[7] In these circumstances,

---

7. Fortes and Jemison contend, however, that "by his own testimony Anton Ward stands as an accomplice," since by harboring individuals that he knew had committed a crime, he was an accessory after the fact. *See* 18 U.S.C. § 3. Without deciding that issue, we do note that this argument runs counter to much of the relevant authority. *See, e. g., United States v.* *DeCicco,* 424 F.2d 531, 532 (5th Cir. 1970) ("The usual test for determining if a witness is an accomplice for the [purpose of a cautionary instruction] is whether he is concerned in the commission of the *specific crime* with which the defendant is charged . . . or could be indicted or convicted of the *identical offense* for which the defendant is being prosecuted

where the testimony of the witness was credible and consistent and where the evidence failed to clearly demonstrate that the witness was an accomplice or informant, we do not find plain error in the court's refusal to offer a cautionary instruction.

### V.

■ At the time of Jemison's conviction she was 20 years old, and thus eligible to be sentenced by the district court as a "youth offender" pursuant to the provisions of the Federal Youth Corrections Act, (FYCA), 18 U.S.C. §§ 5005, *et seq.* Under that act the court was required to make an express finding that Jemison would not benefit from a youth sentence before sentencing her as an adult under the applicable penal statutes. 18 U.S.C. § 5010(d); *Dorszynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1977). As the court below imposed an adult sentence without making a finding of "no benefit" we remand so that an appropriate finding may be made by the sentencing judge.

At the initial disposition hearing held on February 27, 1979, the district court was informed that Jemison had recently begun serving a five-year adult sentence for conspiracy to commit bank robbery, imposed by the District Court for the District of Connecticut. The chief probation officer further informed the court that Jemison's treatment under a Youth Act sentence would not vary significantly from that she would receive during her adult confinement. Considering this last information, the court commented that as "there is no separate program, I have no difficulty in finding the defendant will not derive benefit from treatment under [the Act]." Jemison then received an eight-year adult sentence to run concurrently with that already imposed by the Connecticut court.

On March 1, 1979, however, Jemison filed a motion to correct illegal sentence under Fed.R.Crim.P. 35 on the ground that the court's "no benefit" finding "was based improperly and erroneously on the government's claim that her treatment under [the] Act would be no different than her treatment under an adult sentence." After a hearing on this motion, the court entered an order agreeing with Jemison's main contention; the court stated: "Because the statute specifically provides for separate treatment and facilities, [Jemison] argues that the court should not be influenced by or collude in a violation of the statute by the Bureau of Prisons. In this I believe the defendant is absolutely correct." Although thus vitiating its earlier "no benefit" find-

. . . .") (Emphasis added); *Government of Virgin Islands v. Rivera Solis*, 359 F.2d 518, 520 (3d Cir. 1966) (for purposes of rule requiring corroboration of accomplice testimony, misprision is a separate offense distinct from the crime with which defendant is charged). In regard to Ward's alleged status as an informant, appellants suggested to the district court at a bench conference that Ward had made a "deal" with the government in return for his agreement to testify and thus should be considered an informant. Even if we were willing to accept the contention that one who agrees to testify in exchange for a reduced sentence or other lenient treatment is an informant for the purpose of requiring a cautionary instruction, *but see McMillen v. United States*, 386 F.2d 29, 34 (1st Cir. 1967), *cert. denied*, 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968) (referring to "paid informer"); *Gordon v. United States*, 438 F.2d 858, 875 (5th Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971) (defining informer as an undisclosed person who confidentially volunteers material information of violations of law to law enforcement officials), no evidence whatsoever was introduced indicating that Ward had entered into any such arrangement. In fact appellants purposely avoided probing Ward's motive to testify in fear that the government would then present evidence establishing that Ward's true reason for testifying was that Fortes had attempted to kill him. Having deliberately avoided exploring the question of motivation, appellants can hardly complain now that an instruction was required to warn the jury to consider that motive. We agree with the district court which noted in rejecting appellants' request for an informant instruction:

"Now, you made a strategic decision maybe a sound one, due to the fact, as I understand, your client tried to shoot this man. But, if your client did, in fact, shoot him, I guess if your client has, by his own actions, limited your strategy here, I can't feel very bad about it.

"In order to keep that fact out, you did not go into this other thing. Now, that is a choice, I think probably a perfectly reasonable choice, but you are stuck with it."

ing, the court nevertheless denied Jemison's motion, considering but rejecting the possibility of imposing a youth sentence and having Jemison serve her Connecticut adult sentence at a youth corrections facility. The court stated its reasons as follows:

"The problem with that solution is that it frustrates the judgment of the District Court of Connecticut. That court's adult sentence is a judgment which of necessity imports a finding of fact that the defendant will not derive benefit from treatment provided by the Youth Correction Division, 18 U.S.C. § 4010 [5010](b), (c) and (d). While it is probably true that no strict doctrine of res judicata applies in this situation, nevertheless, the policy against conflicting determinations on the same facts as between the same parties applies with equal force."

Nowhere did the court make an express finding of no benefit. In fact, the court noted that if it were not for the Connecticut judgment it would commit Jemison under the FYCA and, further, that if Jemison was successful in appealing her Connecticut conviction "the situation will be completely changed."

The district court was apparently persuaded to proceed as it did by concern as to the possible spill-over effects of a concurrent youth sentence on the previously imposed adult sentence. It spoke of the frustration of the Connecticut court's judgment and of policies deriving from the doctrine of res judicata. We believe that this focus was misplaced. A district court cannot avoid its statutory obligation to assess the possible benefit to a youth offender of disposition under the FYCA by shifting its view to the peripheral impact of its finding on a previously imposed adult sentence. The language of the statute is quite clear. After itemizing the sentencing options available under the Act, the statute states simply that "If the court shall find that the youth offender will not derive benefit from treatment under [those alternative sentencing procedures], then the court may sentence the youth offender under any other applicable penalty provision." In *Dorszynski v. United States, supra,* the Court con-

sidered the boundaries of the Section 5010(d) "no benefit" requirement and concluded that an express finding of no benefit must be made on the record, though holding that such finding need not be accompanied by supporting reasons. The Court found that the explicit "no benefit" finding was required to ensure that the sentencing judge actually exercised his discretion in choosing not to commit a youth offender to treatment under the Act. *Id.* at 443, 94 S.Ct. at 3052. Drawing a distinction relevant to today's case, the Court observed that "[a]lthough well-established doctrine bars review of the exercise of sentencing discretion, *limited review is available when sentencing discretion is not exercised at all." Id.,* (Emphasis added) (Citations omitted).

In the present case there is no clear indication the court did exercise its discretion under the Youth Act. By stating that it felt somehow bound to follow the previously imposed Connecticut adult sentence and that but for that sentence it would have granted the requested Youth Act disposition the district court indicated that while, as mandated by *Dorszynski,* it had "considered the alternative of sentencing under the Act," it had not, as also required by that decision *"decided* that the youth offender would not derive benefit from treatment under the Act." *Id.* at 444, 94 S.Ct. at 3053. (Emphasis added.) *Cf. United States v. Ingram,* 530 F.2d 602 (4th Cir. 1976). The court was not entitled to deny Youth Act sentencing on grounds different from those provided for in the statute. While a youth sentence superimposed on an existing adult sentence may impact on the place and terms of confinement, *see* sections 5010, 5011, 5017; *but see* section 5015, the second sentence does not alter or eliminate the basic fact of the earlier imposed initial sentence. It thus cannot be deemed to "frustrate" the first court's judgment. By the same token, the sentencing court in the later proceeding is both authorized and directed to make its own independent determination as to "no benefit." As one court facing a related question

under the Youth Act noted, "[no pre-emption can] be implied or compelled by comity between federal courts. Res judicata and estoppel are surely inapplicable . . . ." *Roddy v. United States,* 509 F.2d 1145, 1147 (10th Cir. 1975). *See also Johnson v. United States,* 391 A.2d 1383 (D.C.C.A.1978). *But see United States v. Coefield,* 476 F.2d 1152, 1162 (D.C. Cir. 1973) (MacKinnon, J., dissenting).

To be sure, the district court is fully entitled to give whatever weight it deems proper to the earlier court's findings and sentence in reaching its own determination as to whether a youth offender will not derive benefit from treatment under the Act. What it may not do is to avoid making the required ultimate finding while at the same time rejecting a youth sentence on separate grounds of its own choosing. Thus stated, the issue may seem, at bottom, to be a semantic quibble, and it is possible the court here really intended to find "no benefit," taking into account the total picture before it. But we cannot be sure on this record. We therefore remand Jemison's case so as to permit the district court to make the requisite determination under the FYCA. However, before vacating Jemison's sentence and requiring that she be brought before the district court for resentencing we deem it appropriate to allow that court 30 days from the issuance of mandate in which to indicate, if in fact it so believes, that it finds that Jemison will not derive benefit from treatment under the Youth Act. If the court enters an order so stating, the present adult sentence shall stand. If, however, after the 30-day period has passed no such indication is forthcoming, Jemison's adult sentence shall automatically be vacated and she shall be brought before the court for resentencing in a manner not inconsistent with this opinion.

We emphasize that this is not a case where the record as a whole indicates clearly that the district court found "no benefit" but merely neglected to use those exact words, *see United States v. Scruggs,* 538 F.2d 214 (8th Cir. 1976). And we are in no manner reviewing the substantive reasons offered by a district court in support of a finding of "no benefit" and deeming them inadequate. Nor are we holding that a court might never consider a prior finding of "no benefit" as relevant to its own determination—the factors to be used by the district court in reaching its decision are, practically speaking, beyond review and need not be stated on the record. *Dorszynski, supra.* Rather, we are merely insisting that the district court exercise its discretion in express conformity with the statutory standard.

*The judgments of conviction are affirmed as to both appellants except appellant Jemison's sentence is to be vacated if within 30 days following the issuance of mandate the district court has not issued a finding of "no benefit" as to her, in which event she is to be resentenced in a manner not inconsistent herewith.*